## Thomas Self v. The State.

*No. 2875.   Decided March 8.*

1.   **Practice—Evidence.**—A witness may be impeached by the party introducing him in any manner except by proving his bad character.

2.   **Same.**—The exclusion of evidence offered by the defendant, although competent, is not ground for reversal if it appears, in the light of the evidence adduced, that the excluded evidence could not reasonably have influenced the result of the trial favorably to the defendant.

3.   **Same—Charge of the Court—Malice—Threats—Self-Defense—Case Approved.**—The charges of the court in this case on the issues of malice, threats, and self-defense are substantially the same as those given by the court in the preceding case of Powell v. The State; and the rulings in that case thereupon are approved.

4. **Same—Manslaughter.**—See the statement of the case for the substance of evidence *held* not to raise the issue of manslaughter, and therefore not to require of the court an instruction upon that issue.

5. **Same—Circumstantial Evidence.**—The *factum probandum* in homicide is the killing of deceased by the act, agency, or procurement of the defendant. That fact admitted by the defendant (as was done in this case) supplies positive, direct evidence of the *corpus delicti,* and the court properly omits to instruct the jury upon the law of circumstantial evidence. To authorize such an instruction the inculpatory proof must be purely and wholly circumstantial.

6. **Practice—New Trial.**—See the opinion for the substance of evidence set forth in an application for continuance which, in view of the proof on the trial, being both material and probably true, entitled the defendant to a new trial—his application for continuance having been refused.

APPEAL from the District Court of Johnson. Tried below before Hon. J. M. Hall.

The appellant was convicted in the second degree for the murder of J. F. Yarbrough, and his punishment was assessed at a term of thirty-five years in the penitentiary.

A. S. Turner was the first witness for the State. He testified, in substance, that he lived within a mile of the house occupied by the deceased and his family. Deceased was killed after night on September 16, 1887. Between sunset and dark on that evening Miss Hosea Yarbrough, the daughter of deceased, came to witness's house, and witness and his wife, at the request of Miss Hosea, returned with her to the house of deceased. When they arrived they found deceased lying on a pallet spread on the front gallery. He complained of feeling unwell, and had on no outer clothing other than his shirt, pants, and socks. Witness took a seat on the gallery, and his wife went into the back room. Soon afterwards the defendant rode up to the house on horseback. He dismounted, unsaddled his horse, put the saddle on the fence, led his horse to the stable, and then came to the house and took a seat on some cotton sacks on the gallery and entered into conversation with witness. The witness could not say whether or not he and deceased spoke to each other. A few minutes after defendant arrived Dr. Simms rode up to the place and asked if Tom Self was at home. Witness replied that he was, and about that time Mrs. Yarbrough came to the door and called to Dr. Simms to "get down and come in; Hosea is taken very sick." Dr. Simms went into the house, soon came out and went to his horse, got his saddle-bags, and returned to Hosea's sick room. Witness and his wife, his son and daughter, remained at the house about two hours. They left deceased on the porch, and Mrs. Yarbrough, Miss Hosea, defendant, and Dr. Simms somewhere in the house. About ten minutes after witness and his family left deceased's house witness heard three pistol shots fired in rapid succession, at or about deceased's house. There was a straight

chair, but no rocking chair, on the gallery while witness was at deceased's house.

With a few immaterial additions, Mrs. Turner testified substantially as did her husband.

Justice of the Peace Bowman testified for the State that he held the inquest upon the body of the deceased on the night of the homicide. He and the parties with him found the body in the cotton patch, about thirty yards from the house. Three 45-calibre pistol balls had penetrated the body. One ball entered the left breast just below the collar bone, another, one side and lodged under the skin on the other side, and the third entered at the back. The wound in the back was powder burned, and a hole as large as a man's hand was burned in the shirt on the back. No blood was found on the pallet or on the porch. The first blood found by witness was on the ground, three or four feet from the porch steps. There was a straight chair on the porch, but witness saw no rocking chair.

The material facts testified to by the State's witness Veatch were that about dark on the fatal evening the defendant came to his house and borrowed his pistol for the purpose, as stated by him, of killing some dogs that had been annoying him. He left a pistol at witness's house, which he said belonged to Hill Cummings, but which would not revolve. The wife of the deceased was the sister of defendant, and it was the understanding of witness that defendant owned the place occupied by the deceased at the time of the killing.

S. H. Birdwell testified for the State, in effect, that about a week before the homicide he and the defendant helped deceased drive some cattle through Hood County en route to Erath County. At that time deceased and defendant were friendly, and the feeling of deceased for defendant was good.

Dr. Simms testified for the State that he was at the deceased's house on the 16th day of September, 1887, and again that night when deceased was killed. He did not know where the defendant was at the time of the killing, but he was not in the room which the witness, Mrs. Yarbrough, and Hosea then were. The fatal shots were fired near the gallery on which the witness last saw the deceased alive.

On cross-examination the witness stated that he met the deceased on September 16, 1887, when deceased invited him to call at his house for the purpose of holding a conversation about a serious matter. About four o'clock on that evening the witness stopped at deceased's fence and called him out. In the conversation that ensued deceased told defendant that he had moved his cattle to Erath County, and was going to take up his residence in that county, but was not going to take his family, as he could not get along with his wife, whom he abused, and denounced as a liar, etc. Witness asked deceased's permission to talk to Mrs. Yarbrough for the purpose of bringing about a reconciliation. Deceased consented, whereupon witness went into the house, and deceased to the cotton patch

south of the house. While witness was talking to Mrs. Yarbrough the defendant came to the house. Witness asked him to go home with him. Defendant consented, and en route the witness told defendant what deceased had that evening said about his wife, and further, which was true, that deceased also said that he, defendant, upheld Mrs. Yarbrough in her meanness, and that he intended to kill him, defendant, if it was the last thing he ever did. Witness then advised defendant, as a means of avoiding trouble, to leave the neighborhood until deceased had gone to Erath County. Defendant shed tears, and replied that in his opinion his sister was a good woman, and that he disliked to see her treated like a d—d dog. Witness again advised him to leave home in order to avoid trouble. Defendant agreed to do so. About that time they met Hill Cummings, who asked witness to go to Claridge's to see a sick child. Witness told defendant to go on to his, witness's, house, and went himself to Claridge's. When he finished treating Claridge's child he went back to Yarbrough's to see if defendant was there. To his inquiry from the gate several voices replied that defendant was there, and Mrs. Yarbrough called to witness that Hosea was sick, and wanted to see him. Witness went in and found Turner and his family there, and deceased lying on a pallet on the porch. From Hosea's room witness went to his horse to get his medicine bags, and back into Hosea's room. Some time afterwards the Turners left, and a few minutes later witness heard three shots fired at the gallery. A few minutes before those shots, which was the last time witness observed the defendant before the shooting, he was sitting in Hosea's room, in which the witness and Mrs. Yarbrough were. A few moments after the shooting he came to the outer door of Hosea's room, got a knife from the witness, with which he cut the rope by which his horse was tied, saddled his horse, and rode off.

On redirect examination the witness stated that defendant had recently bought the premises from deceased, and had an ungathered crop of cotton, corn, and potatoes on it. He also owned some horses and cows, but witness did not know how many. He rode off with no other clothing than he had on his person. On recross-examination the witness denied that he told deceased's brother, J. C. Yarbrough, on the day after the homicide, that he never heard the deceased utter a threat against the defendant. Upon this statement he was contradicted directly by the State's witness J. C. Yarbrough. The State closed.

J. H. Claridge testified for the defense, in substance, that he had contracted to buy the ungathered crop of the defendant, and, at the time of the homicide, was negotiating with deceased for the purchase of his crop. He met the deceased on the evening of the fatal day, and asked him if it was true, as he had heard, that defendant owned an interest in the crop he, deceased, was trying to sell him. After some hesitation deceased replied that it was true, but that such fact need not stand in the way of the trade, as defendant's interest would never do him, defend-

ant, any good.    On the morning after the homicide the witness found
an open pocket knife of large dimensions in the front yard near the
porch steps, and on a line with the place where the body of deceased was
found.    He identified that knife as the property of the deceased.    Lear
corroborated Claridge as to the finding of the pocket knife, and two other
witnesses testified that they heard of the knife being found by Claridge,
but did not see it.

J. L. Orrick, whose wife was the defendant's aunt, testified, in sub-
stance, that about two months before the homicide the deceased told him
that defendant still owed him part of the purchase money for the place,
and that he intended to close defendant out, take the place, and keep
what money defendant had paid on the purchase.    Witness knew as a
fact that deceased had treated defendant with great severity and unkind-
ness for years.

W. D. Orrick, the cousin of defendant, testified that defendant reached
his house in Tarrant County about four o'clock on the morning after the
homicide.    He told witness that he had killed deceased, but that as he
had no more than about $5 in money, he thought it best to return and
stand trial.    The witness advised him not to do so until the excitement
had died out, and lent him money.    He left, saying he would return and
surrender in four months.

Mrs. Mary Lear, formerly Mrs. Yarbrough, the wife of deceased and
sister of defendant, testified substantially as did Dr. Simms as to what
transpired at the house immediately before and at the time of the killing,
except that she stated that defendant was not at the house when Dr.
Simms arrived the last time, but came up soon afterwards.    She testified
further that when he came to the house the defendant hung up his sad-
dle on the gallery—a direct contradiction of the testimony of the other
witnesses, who stated that he hung his saddle on the fence.    The record
recites:    "This witness was contradicted in the details of her statements
upon many things."    She declared that for years the deceased treated her
with inhuman cruelty, whipping her, and on one occasion pulling her
off of a horse.    She stated further that after defendant left with Dr.
Simms on the fatal evening deceased told her that he intended to kill
defendant before morning.

Testifying in his own behalf, the defendant corroborated the testimony
of Dr. Simms as to the time, a few moments before the shooting, when
he left Hosea's sick room.    Continuing, he stated that on leaving Hosea's
room, in which he left Dr. Simms and Mrs. Yarbrough attending upon
Hosea, he stepped upon the gallery, where he found the deceased sitting
in a rocking chair.    Thence he proceeded to the lot and fed his horse.
Returning, he stepped upon the gallery, when deceased got up from the
chair and said to him, "Tom, I am going to kill you!"    Witness ex-
tended his left hand and replied, "Frank, don't!"    Deceased advanced

with something in his right hand which witness took to be a knife. Witness opened fire at once. He fired the first two shots facing the deceased, and the last as the deceased went down the steps, deceased's back being then towards him. The witness did not know at the time that his first two shots took effect, but knew that the last one did. The witness knew that deceased was unkind to his sister, but shot him because he thought deceased would kill him. Deceased was always unkind to witness. Witness used Veatch's pistol, which he borrowed on that evening after Dr. Simms had told him of deceased's threat.

Several witnesses for the State, in rebuttal, impugned the reputation of Mrs. Lear for truth and veracity, the majority of them declaring that it was good until the killing of Yarbrough.

*Crane & Ramsey,* for appellant.—The sixth assignment of error is as follows: "The court erred in defining malice in its general charge to the jury, in that it told them, in effect, that 'malice as used in this charge is the intentional doing of a wrong act without legal justification or excuse,'" which said statement left the jury to ask and answer but two questions: 1. Was the killing intentional? 2. Was the killing wrongful? Answering both of these in the affirmative, then it follows that they must find that the killing was with malice, and therefore murder; all of which definition was excepted to at the time said charge was delivered. The general definition of the term malice, as contained in the charge of the court, is as follows: "The word malice as used in this charge means the intentional doing of a wrong act towards another person without legal excuse or justification."

The charge, considered as a whole, instructs them, first, to ascertain whether the killing was wrongful; second, was it intentional; third, was it justifiable. Answering the first two of these questions in the affirmative, and the last in the negative, they must find that the killing was malicious, and therefore murder. If it is necessary to define malice, it ought to be necessary to correctly define it. And when the court tells the jury that malice as used in this charge means the intentional doing of a wrongful act without legal justification or excuse, they naturally ask the question, "Did the defendant intentionally kill the deceased?" The answer is "Yes." "Did he have any legal excuse?" "No." "Did he kill him in self-defense?" "No." "Then was it done without legal excuse or justification?" "Yes." "Was it then a wrongful act?" "Of course," answers the jury; "how could it be otherwise when neither excusable nor justifiable?" "Well, then," says the court, "*it was done with malice, because I tell you, gentlemen, that all intentional wrongful killing, neither excusable nor justifiable in law, is malicious, and therefore murder.*"

If this definition is correct, there is no such an offense as manslaughter. The statute in reference to that offense might as well be repealed. In

manslaughter the killing must be intentional, wrongful, and without legal justification or excuse.   If the court had added, as this court did in the case of Tooney v. The State, 5 Texas Court of Appeals, 163, that the killing must be without any cause which will in law justify, excuse, or extenuate the homicide, the correctness of the definition would not now be questioned.   It would be in harmony with the law as has been understood by the bench and the bar for ages.   It would be in harmony with the definition given by the Supreme Court of this State in the case of McCoy v. The State, 25 Texas, 39.   Judge White, in the case of Hays v. The State, 14 Texas Court of Appeals, 331, a case in which the trial court had defined malice as the voluntary doing of an unlawful act, with the intent, means, and ability to perform it, etc., held the definition erroneous, and for the reason so clearly stated by him in these words:  "The definition of malice aforethought is not correct, for under it a party may commit a killing which would be manslaughter only.   The voluntary doing of an unlawful act, with the intent, means, and ability to accomplish it, would be manslaughter if it was the result of sudden passion and upon adequate cause."

The argument contained in the paragraph quoted can not be met by the State's counsel, nor improved upon by us.   We submit it to this court as unanswerable.

That the definition of malice as given in this charge might be correct in cases of malicious mischief, or even in any case where neither the law nor the evidence raised any question of the degree of the crime, might be conceded; but where, as in this case, defendant insists that if guilty of any degree of culpable homicide he is guilty of manslaughter only, that the killing was not malicious, the definition is erroneous and damaging. To say the least, it is confusing and liable to mislead, and when excepted to, as in this case, should not have been given and ought to have been corrected.   Suppose A strikes B with a cowhide in a public street, and B draws a pistol and shoots him down or kills him.   He shoots him down intentionally, does he not?   He shoots him wrongfully, contrary to law, does he not?   If not unlawful, it would be a burning shame to convict him and send him to the penitentiary for killing a man whom he had a right to kill, and then call the offense manslaughter.   If intentionally and wrongfully done, it would be a malicious killing—murder; it could not be manslaughter.

Our eighth assignment of error questions the sufficiency of the charge on threats.   The charge was, in substance, as follows:   "And if you believe from the evidence that J. F. Yarbrough had threatened the life of the defendant, or to do him seriously bodily harm, and that at the time of the killing the deceased, by his acts, or by his words coupled with his acts, showed an immediate intention to put his threats into execution, then you will find the defendant not guilty."   This charge makes the entire

defense depend upon the one question—that is, did the jury believe that
the deceased had threatened to take the life of the defendant, or to do
him serious bodily injury?   Granting, for argument's sake, that the re-
maining portion of said charge was correct, was it right to compel the
jury to believe absolutely that the deceased threatened to kill the defend-
ant before they could acquit him?   It will be remembered that in this case
Dr. Simms testified that the deceased did make such threats, and that he
communicated the same to the defendant before the killing.   The de-
fendant testified to the same.   The State then undertook to impeach the
witness Simms by showing that he had made contradictory statements to J.
C. Yarbrough to the effect that the deceased made no threats against the
defendant.   J. C. Yarbrough, brother of the deceased, so testified..   Now,
suppose for a moment that the jury did not believe that the deceased made
any such threats, but that they did believe that Simms told the defend-
ant that the deceased had threatened his life, and the defendant believed
said Simms.   Then suppose that the deceased afterwards did something
which the defendant afterwards construed to be an effort to carry the sup-
posed threat into execution, would he not have a right to act, even though
the jury believe, after having heard the evidence, that Simms did not tell
him the truth?   Common sense would say yes; justice and humanity would
say yes.   Certainly the defendant ought not to be victimized.   If he be-
lieved the threats had been made, and acted on such belief, it ought to be
sufficient.   Suppose A tells B that C has threatened B's life.   B believes
this statement; he meets C, and construing some act of C as an intention
to carry that threat into execution, kills him; and then upon trial B
himself believes, as well as the jury, that A told him a falsehood, but the
jury also find that at the time B killed C he believed it and acted on such
belief, ought B to suffer for a mistake thus honestly made?   Should the
jury be told in that kind of a case that unless they believed that the de-
ceased had threatened the life of the defendant they could not consider
the other matter in that connection?

Again, the court tells the jury in the same connection that although
they may believe that the deceased did make threats against the defend-
ant, yet if they believed beyond a reasonable doubt that he made no
effort to execute them they will find that defendant had no right to take
the life of the deceased.   In other words, if the jury after hearing all
the evidence and argument of counsel do not believe that the deceased
made any threats, or if he did, that they do not believe he attempted by
any act to execute them, why he is unjustifiable.   Would it not have
been wiser—indeed, would it not have been right in this case—to have
told the jury that if they believed that the defendant had been told that
the deceased had threatened to kill him, and that he believed the in-
formation thus conveyed to him, and that at the time of the killing the
deceased did some act which the defendant believed to be an effort to carry

such threat into execution, and that it reasonably appeared to him that such was the intention of the deceased, that the defendant had a right to kill him, and if they had a reasonable doubt as to the existence of these facts they should acquit him.

Such a charge would have enabled the jury to judge of the necessity, or apparent necessity, of taking the life of the deceased from the standpoint of the defendant at the time of the homicide, and not from the standpoint of the jury after hearing all the evidence. Such a charge was at least suggested by special charge No. 2, asked by the defendant, and refused by the court. Rockhold v. The State, 16 Texas Ct. App., 585.

Had there been no controversy about the threats having been made, or had the effort to execute them been proved by testimony other than that of the defendant, the error might not be so apparent. But, inasmuch as both points were contested, we submit that the charge as given was erroneous. Penal Code, art. 608; Patillo v. The State, 22 Texas Ct. App., 593.

Having been excepted to at the time of trial, for the reasons above stated, it follows that the case must be reversed. Code Crim. Proc., arts. 677 and 685; Wills. Crim. Stats., sec. 2363.

The error being fundamental—going to the very foundation of the defense—would, in the absence of exception, necessitate a reversal. Loyd v. The State, 19 Texas Ct. App., 321.

The court was equally unhappy in its charge on self-defense. On that point it made the justification of the defendant depend upon the existence of a fact—that is, whether the deceased made an attack upon the defendant. The objection to this portion of his charge as well as the objection to his charge on self-defense in connection with threats might be briefly summarized in these words: that they require the jury to believe that certain acts were done and certain threats were made by the deceased before and at the time of the homicide; while the law only requires the jury, at most, to believe that the defendant thought at the time of the killing that said threats had been made by deceased, and that the act was done by him, indicating an intention on the part of the deceased to do him great bodily harm.

The twelfth assignment of error is as follows: "Because the court erred in not charging the jury on the subject of circumstantial evidence in this, that there was no evidence to connect the defendant with the killing other than circumstantial evidence, unless the jury credited the statements of the defendant, which they manifestly did not. Rejecting his testimony, the inculpatory evidence was wholly circumstantial. The failure to charge on that subject was excepted to at the time." The court's explanation for refusing to charge the jury with reference to the rule in cases of circumstantial evidence is as follows: "The fifth exception was overruled because

it was not a case exclusively of circumstantial evidence, as the defendant testified he killed deceased in self-defense." The question raised and presented here is a clear as it is an important one. In a case in which the inculpatory facts are all circumstantial in character, is the court relieved from charging on the effect of circumstantial evidence, because the defendant admits the killing (not murder), and testifies to facts justifying him in so doing? We confidently assert that so far from being relieved from so charging, that, from sundry views, it becomes more important that it should do so. No one who examines the record in this case can doubt that the inculpatory evidence relied on by the State is wholly and purely circumstantial. To what effect is the testimony of the State? The preparation by borrowing arms, his supposed tracks, his presence at the house at the time of the homicide, his flight, and, indeed, every fact relied on of the least consequence. Now it is in cases in which the inculpatory facts are circumstantial that the charge is required to be given. Nor is the court relieved from giving such a charge because there is direct proof of some important fact. In the case of Tooney v. The State, 8 Texas Court of Appeals, 452, the court say that it is only in cases not dependent on circumstantial evidence in a controlling or definite degree, that such a charge need not be given. Now, we submit that the converse of that proposition is true, and that in a case where the evidence in a controlling or definite degree is circumstantial, that the court must give a charge on circumstantial evidence. Can any one deny or even doubt that the inculpatory facts in this case were in a controlling degree circumstantial? That they are so there can be no question. In the case of Buntain v. The State, 15 Texas Court of Appeals, 515, in which Judge White held that a charge on circumstantial evidence was not demanded by the facts of that case, he states the true rule to be, "a charge upon circumstantial evidence is only required when the evidence of the main facts essential to guilt is purely and entirely circumstantial." This is the rule which we have asked and now ask to be applied to this case. If, however, authority were wanting we would willingly submit this question to the decision of this court, aided only by legal reason or principle. Let us look at it in that light solely. Undoubtedly then, if when the State had introduced its evidence on which a conviction was sought, the defendant had introduced no evidence, and the case was thus submitted, the court would have been required to charge on circumstantial evidence. Why so? The answer is obvious, because the inculpatory facts—the facts relied on to secure a conviction—are wholly and purely circumstantial. What then can change the rule, and when is the court relieved from the duty of such a charge? Only when the inculpatory facts cease to be or are not circumstantial. Suppose the defensive evidence is positive. Can that fact change the rule testing the cogency of the criminative evidence? On what principle? Let it be conceded that the defendant admits the killing, and says it was done in self-defense. He is not

charged with killing, but with murder. How can this admission change a rule of law which is to guide the jury in considering and weighing the State's case? Now, if the defendant had offered no testimony the jury would have been instructed on circumstantial evidence, and, so guided, would have had to determine the question of defendant's guilt. But the State's position is that as soon as the defendant admits the killing, although he asserts it most earnestly to have been in self-defense, although the State's evidence is circumstantial, the usual test by which circumstantial evidence is weighed may be dispensed with. Suppose the defendant had offered no evidence. As above stated, a charge on circumstantial evidence would have been indispensable. In this case the State relies wholly on circumstantial evidence to make out its case, but also to overcome the positive testimony of the defendant.

The court below intimates that because the defendant in his own testimony admitted the bare fact of the killing, that he was relieved from charging on the subject of circumstantial evidence. In admitting the killing he confessed himself guilty of no crime. He admitted a solitary fact, innocent in itself, because, if he killed the deceased under the circumstances stated by him, he committed no offense. If it be conceded that a charge on circumstantial evidence would have been necessary had not the defendant admitted the mere fact of the killing, then, we submit, it was rendered more necessary by the defendant's testimony; because, after he testified, the State relied upon circumstantial evidence to show that his statement of the cause and manner of the killing, showing same to have been justifiable, was, in fact, untrue.

Authorities are not wanting which assert the rule to be that unless the evidence is wholly circumstantial the court need not charge on that subject; but that rule, it is believed, is announced only in such cases as had other evidence independent of circumstances which was nearly or quite sufficient to establish the guilt of the defendant. Carr v. The State, 23 Texas Ct. App., 562; Hurd v. The State, 24 Texas Ct. App., 103; 19 Texas Ct. App., 240; Eckert Case, 9 Texas Ct. App., 105.

There being in this case no substantial admission of guilt, but only of justifiable homicide, and the State relying upon circumstantial evidence to show that the homicide was culpable, we insist that all the inculpatory or criminating evidence was circumstantial, and that the court should, as a part of the law of the case, have charged on that subject.

*W. L. Davidson*, Assistant Attorney-General, and *Poindexter & Padelford*, for the State.

WILLSON, JUDGE.—It was not error to permit the State to prove that its witness Simms had made a contradictory statement in relation to the threat about which he testified. His testimony as to the threat was in-

jurious to the prosecution, and it was permissible for the State to attack it in any manner except by proving his bad character.    Code Crim. Proc., art. 755.

In view of the evidence adduced on the trial the rejection of the proposed testimony of the witness Alford, offered by defendant, for the purpose of explaining his continued absence after the homicide, in Arkansas, was not such error as requires a reversal of the judgment.    Said proposed testimony is not of a character which could reasonably have influenced the result favorably to the defendant.    Willson's Crim. Stat., sec. 2540. The testimony, however, was we think admissible.

Objections to the charge of the court upon malice, threats, and self-defense are insisted upon by counsel for defendant.    The charge and the objections thereto are substantially the same as in the case of Powell v. The State, this day decided (*ante,* 393), and we refer to our opinion in that case for a statement of our views and conclusions upon the questions here presented.

There is no evidence which, in our judgment, required a charge upon manslaughter.    Under the facts of the case the homicide was either murder or it was justifiable.    Defendant claimed that it was justifiable, and the evidence excludes the theory of manslaughter.

It is strenuously and plausibly argued by counsel for defendant that an instruction upon circumstantial evidence should have been given.    We do not think such an instruction was required.    Defendant admitted that he killed the deceased.    This was direct, positive evidence of the *corpus delicti*.    In homicide the *factum probandum* is the destruction of the life of the deceased by the act, agency, or procurement of the accused.    The *killing* of the deceased by the defendant is the main fact in the issue. This fact in this case is not wholly proved by circumstances, but is also directly attested by an eye-witness—that is, by the defendant himself. It is not required, in order to dispense with a charge on circumstantial evidence, that the defendant's *guilt* should be established by *direct* evidence.    It is only when the inculpatory evidence is wholly circumstantial, and where the defendant's guilt is dependent wholly upon that character of evidence, that an instruction as to circumstantial evidence is required. Clare v. The State, 26 Texas Ct. App., 624; Willson's Crim. Stats., sec. 2342.    That the defendant killed the deceased was an inculpatory fact, and this fact having been proved by direct evidence, dispensed with the necessity of a charge upon circumstantial evidence.

A question which is to our minds more serious than any other presented in the record is, should not a new trial have been granted the defendant to enable him to obtain the absent testimony set forth in his application for a continuance?    It was contended by the prosecution that the deceased was friendly with the defendant and bore no ill will against him; and testimony was adduced by the State tending to show such state of feeling

on the part of the deceased towards the defendant. By the absent testimony the defendant proposed to prove that the deceased was unfriendly to him; had for a series of years treated him unkindly and inhumanly; and that deceased, some two months before the homicide, had stated that he intended to drive defendant away from the home which he, defendant, had purchased from him, deceased, and appropriate said home to himself, and that said home should never do the defendant any good, and that these declarations of deceased were communicated to the defendant before the homicide.

In view of the testimony adduced on the trial, it must be conceded that said absent testimony is probably true. Is it material? Defendant claims that the homicide was justifiable; that he committed it in self-defense. There was no eye-witness to the tragedy except the defendant. He testified that the deceased was sitting upon the porch; that as he, defendant, stepped upon the porch the deceased said to him, "Tom, I am going to kill you," and arose and started towards him with something in his right hand, which he, defendant, took to be a knife, and that he, defendant, then shot deceased. What bearing would the absent testimony have upon the defendant's theory of self-defense? Would it not tend to support that theory and corroborate the testimony of the defendant given in his own behalf? If, as claimed by the prosecution, the deceased bore no ill will to the defendant, was friendly to him, and had no motive to attack him, it is improbable that he would have attacked him in the manner stated by the defendant. If, on the other hand, the deceased was unfriendly to the defendant and had a motive for attacking him, these facts would render the attack testified to by the defendant probable, and would tend to support the theory of self-defense. We are constrained to conclude and hold that the absent testimony is not only probably true, but that it is relevant and material, and entitles the defendant to a new trial. It may be that if said absent testimony had been before the jury it would not have changed the verdict. We are not prepared to say that it would not reasonably have enured to the advantage of the defendant. Hammond v. The State, this day decided, *post,* 413.

Believing that the defendant is entitled to the absent testimony, and that justice and law demand that he should have it, we reverse the judgment and remand the cause for a new trial.

*Reversed and remanded.*

Hurt, J., absent.