## TOM ANGUS v. THE STATE.

*No. 7056.     Decided June 25.*

1. **Murder—Evidence.**—The State, on a trial for murder, proved that the accused shot and killed the deceased on the 16th day of January, 1889. As matter of defense the accused proved that on a certain night, either in the preceding November or December, he and one Johnson and two women took supper in a room upstairs over a drinking saloon, the window of which room overlooked the back yard of the saloon. A witness for the defense testified that while the defendant and his party were at supper on the said night, he saw the deceased in the back yard of the saloon under the said window; that the deceased, holding a dirk knife in his hand, attempted to scale a plank shed from which he could reach the open window of the room in which the accused and his party were at supper; that in his attempt to scale the shed the deceased created a noise; that he then admonished the witness to "say nothing," exhibited his dirk knife to witness, and said to him, "I will kill the son-of-a-bitch (meaning accused) before daylight;" that deceased then left the yard through the rear gate; that one Touhey, now a non-resident of the State, was with the witness in the yard and heard and saw all that was said and done by the deceased; that soon after the deceased left the yard the accused paid his bill and left the saloon. A woman who was one of the guests of the accused at the supper testified that while the party was at the table Touhey, the waiter, entered the room and told the accused that he had "better look out;" that deceased "was outside and had tried to climb up to the window;" that the accused, "looking uneasy and afraid to stay there," then paid his bill and left. As a part of the *res gestæ* of the transactions of that night, the defense then proposed but was not permitted to prove the acts and declarations of the accused immediately after he was informed by Touhey of the acts and declarations of the deceased, i. e., that he immediately paid his bill and

left the saloon, stating as his reason for so doing that the deceased, armed and threat-ening to kill him, was trying to get into the room occupied by him, and that he was leaving to avoid trouble and escape danger at the hands of deceased. *Held,* that the proposed proof was properly excluded. The acts and declarations of the accused on that occasion were not admissible to prove the then condition of his mind, nor were they a part of the *res gestœ* of the issue on trial—the killing of deceased.

2. Same.—A witness for the defense testified on his examination in chief that several nights previous to the homicide he met the deceased at the house of Dolly Love, and that deceased told him on that occasion that the defendant came to that house on that night and peeped in at the window; that it was the intent of the defendant to kill or hurt Dolly Love, and that if he, deceased, ever caught the defendant about Dolly Love's house again he would "fill him so full of holes that forty doctors could not patch him up," and that he, witness, communicated said threats to the defendant on the next day. As authorized by this evidence the defense proposed to prove by the witness the declarations of the defendant when informed of the threats, to the effect that he was not at Dolly Love's house on the previous night; that he did not peep in at the win-dow; that he did not know why deceased persistently followed him in an attempt to provoke a difficulty; that he had never done the deceased an injury, and that he did not intend to have trouble with the deceased if he could avoid it, and that to avoid trouble he never visited Dolly Love's house when he knew deceased to be there. The declarations of the defendant to the witness, as thus proposed to be proved, were prop-erly excluded.

3. Same.—Over the objections of the defense the State was permitted to prove that on two occasions prior to the homicide the defendant, mistaking one Jenkins for the deceased, drew his pistol on and attempted to kill Jenkins, and thereafter, apologizing for so doing, explained that on each occasion he took Jenkins for and believed him to be the deceased. *Held,* that as competent upon the questions of *animus* and malice, the proof was properly admitted.

4. Practice—Manslaughter—Charge of the Court.—Special charges are prop-erly refused when, as in this case, the general charge responds fully to every phase of case presented by the evidence. Manslaughter was not an issue raised by the proof, and therefore in omitting to submit it to the jury the trial court did not err.

APPEAL from the District Court of the Fourteenth Judicial District of Dallas. Tried below before J. C. Muse, Esq., Special Judge.

This conviction was in the second degree for the murder of Charles Bradley, and the penalty assessed by the verdict was a term of five years in the penitentiary.

The statement of facts in this case covers about sixty type-written pages of the transcript. The State's testimony in chief alone occupies the first thirty pages, but the statements of the various witnesses are so nearly in accord that it is not deemed essential to this report that they be summar-ized separately and in detail.

Dr. R. W. Allen was the first witness for the State, and the purpose of his testimony was to describe and locate the wounds on the person of the deceased. He viewed the body either on the evening of the day of the killing or on the morning of the following day. Gun or pistol shot wounds caused the death of the deceased. The body showed four bullet holes, each of two bullets making two holes in passing into and through the body. One of the bullets entered between the sixth and seventh ribs

on the right side, a little behind a line running from the armpit to the hip, and passed out at the left side a little higher up the body. The other bullet entered the right arm from behind and a little above the elbow joint and passed out on the opposite side of the arm. The wound through the chest passed through both lungs and either cut the heart or one of the large arteries leading from it. It was a necessarily fatal wound. Both wounds appeared to have been inflicted from behind.

This killing occurred at or near the intersection of Main and Austin streets, in the city of Dallas, Texas. The four corners formed by the intersection of the said streets were occupied as follows: Swope & Mangold's saloon occupied the northwest corner; the Grand Windsor Hotel the southwest corner; Purdy & Randell's saloon, otherwise called the "Board of Trade," the northeast corner, and the Cabinet Saloon the southeast corner. The shots were fired from Swope & Mangold's corner, and the deceased fell at the side door of the Cabinet Saloon.

J. W. Wilhite testified for the State that he witnessed the shooting of Bradley. It occurred between 8 and 10 o'clock on the morning of January 16, 1889. At the time that the shooting commenced the witness was occupying a bootblack's chair on the east side of Swope & Mangold's building, and about twenty feet from the corner of that building. Scott McCoy, who was talking to witness, called witness's attention to a 'bus standing in front of the Grand Windsor Hotel, which was south of witness. Looking in that direction the witness saw a man wearing a light-colored overcoat (the deceased) on the east sidewalk of the Swope & Mangold building. He was going east, towards Purdy & Randell's saloon, and was in the act of stepping off the curb or sidewalk. He had something in his hand which the witness took to be a paper. An instant after he observed that man the witness saw about eight inches of a man's arm, the hand holding a pistol pointed east and towards the deceased, protruding from around the corner of the Swope & Mangold building. A moment later the pistol, which was not above six feet distant from the deceased, was discharged. Deceased threw his hands to his chest, exclaimed "Oh!" swerved to the right, and started diagonally across the street towards the Cabinet Saloon. Immediately after the first shot was fired the defendant, coming into the witness's view, advanced along the sidewalk and fired a second shot at the deceased, who had then reached a point in the street about fifteen feet from the curb. Defendant then stepped off the sidewalk and fired the third shot, the deceased having then reached a point in the street midway between the Swope & Mangold and the Cabinet Saloon corners. Defendant was then arrested. The witness was unable to state whether or not deceased came out of Swope & Mangold's establishment at the front, but he did not come out of the east side door, near which the witness was sitting. The deceased did not look back or around after the first shot was fired.

On cross-examination the witness stated that a telephone pole stood at the southeast corner of the sidewalk in front of Swope & Mangold's establishment. Bradley, when first seen by witness, was about two feet north of and opposite the telephone pole. He at no time faced the defendant. His right side was never presented to the defendant while witness saw him. His back was to the defendant all of the time.

W. P. Porter testified for the State that he was standing at the "Board of Trade" corner, near the end of the sidewalk, when the shooting occurred. The defendant, when the witness first saw him, and another man were standing on the inside of one of the east doors in the Swope & Mangold building. A moment later deceased came out of the first or second door west of defendant and started east toward the corner where the witness was. When he passed defendant he "turned his face that way." Defendant then advanced one and perhaps both feet out of the door, threw his pistol down and fired. Deceased, who was then in the act of stepping off the sidewalk about two and a half feet from the telephone pole at Swope's corner, threw his hands to his stomach and ran angling across the street toward the Cabinet Saloon exclaiming "Oh!" or "Oh Lordy!" When the first shot was fired deceased was facing the "Board of Trade" with his back toward the defendant. After firing the first shot the defendant advanced to the edge of the sidewalk and fired two shots in quick succession at deceased as he fled toward the Cabinet Saloon. When he received the first shot the deceased had just pulled up his overcoat collar, and his hands were hanging at his sides. Immediately after the first shot was fired the witness heard somebody—he could not tell who—exclaim, "Give it to him! Give it to him! Give it to the son-of-a-bitch!" John Witt and the witness were together at the time of the shooting. Witness did not know the man Dick Johnson.

Of the numerous other witnesses for the State, all of whom witnessed the shooting from different points of view, and gave in testimony substantially the same account of it as the witnesses Wilhite and Porter, but one claimed to have heard the exclamation of a third party after the first shot, as testified by Porter, i. e., "Give it to him! Give it to the son-of-a-bitch!"

A number of witnesses, including an ex-sheriff of Dallas County and several policemen of the city of Dallas, testified that the general reputation of the deceased in the community was that he was a turbulent, quarrelsome, and dangerous man, and one who would most probably execute a serious threat.

R. R. Nelms testified for the defense that he was the proprietor of the Sunny South Saloon in Dallas. The defendant came to the witness's saloon something more than an hour before the shooting, passed into the back room, and with the witness and two others engaged in a game of dominoes. From the place in the room where the game was played Swope & Mangold's

corner could not be seen.   Defendant was in a pleasant humor throughout the game, and appeared to enjoy it very much.   After playing forty-five minutes or perhaps an hour the defendant remarked that he had to go, and quit the game.   He left, and the shooting occurred within the next fifteen minutes.

William Ward was the next witness for the defense.   He testified that during the winter of 1888–89 he was the proprietor of a saloon at the corner of Young and Austin streets, in the city of Dallas.   He conducted a restaurant in connection with that saloon.   In November or December, 1888, he gave a free supper, to which he especially invited the defendant and Dick Johnson, Dolly Love, and Kitty Clyde.   The defendant and his party attended, and occupied one of the upstairs supper rooms.   The deceased and one Butts, sometimes called Grefe, also attended the supper, but occupied a different supper room.   The window of the supper room occupied by the defendant and his party overlooked a back yard, and immediately under that window was a shed so built as to make a duck and chicken coop or pen.   Defendant paid his bill—which included only the drinks served, the supper being free—and with his party left about 10 o'clock, two hours before the supper was over.   Witness did not of his own knowledge know where the deceased was at the time defendant left, but was informed by other parties.   Defendant looked uneasy when he left, and acted like he was afraid to remain longer.   He did not return to witness's saloon on that night.

Red Stewart testified for the defense that he was in the employ of Mr. Ward, the preceding witness, in the winter of 1888–89, and was at work about the saloon premises during the night of the free supper referred to by Ward.   The shed mentioned by Mr. Ward abutted from the wall under the window of the supper room occupied by defendant and his party, and slanted to a fence in the yard.   There was a well in the yard near the shed.   Witness had occasion to go to that well while the defendant and his party were at supper.   Deceased came into the yard while witness was at the well, mounted the fence with a long dirk knife in his hand, and attempted to scale the shed.   In slipping or falling back he created a noise, and said to witness, "Red, don't you say anything.   I will kill that son-of-a-bitch before morning."   He then passed out of the yard through the back gate.   He did not call the defendant's name when he said he would kill the son-of-a-bitch.   Will Touhey, now of Hot Springs, Arkansas, the waiter who was serving the room occupied by the defendant and his party, was in the yard and saw deceased when he attempted to scale the shed with the dirk knife in his hand, and heard deceased say that he would "kill the son-of-a-bitch before morning."   Of this fact the witness was positive, because he and Touhey had often discussed the occurrence.   Touhey went back to the supper room occupied by defendant and his party immediately after deceased left the yard, and defendant and his party left the saloon

soon afterwards. The shed referred to reached within eight feet of the sill of the window of the supper room occupied by the defendant, and that sill could be reached by the hands of a man standing on the shed.

Kitty Clyde testified for the defense that she was one of the supper party at Ward's free supper referred to by previous witnesses. About 10 o'clock on that night Will Touhey, the waiter, came into the supper room and told defendant to "look out;" that the deceased was outside trying to climb up to the window. Defendant thereupon paid for the liquors that had been served, and the party left the saloon and went to the "sporting" house of Dolly Love, of which the witness was then an inmate.

Wm. Turnelle testified that his business during the winter of 1888–89 was that of night watchman. He went to Dolly Love's house on Young Street one night in September or October, 1888, in response to the call of a police whistle. He found deceased, Dolly Love, another young woman, and a little girl at the house. Deceased then said to witness that defendant had been there that night peeping in through a window, and that if he "caught the son-of-a-bitch there again he would kill him." Afterwards, in October or November, the hour being about 3 o'clock in the morning, the witness met the deceased on the square. Not recognizing him at first, the witness asked him what he was looking for at that hour. He replied that he was looking for the Grand Windsor Hotel. Witness then recognized him and said to him, "Captain, you know where the Grand Windsor is as well as I do." Deceased then said that he was going to Tom Angus' room to meet Dolly Love. Witness said to him, "You and Mr. Angus have had several quarrels and you had better not go up there." He replied, "I can take a corn cob and a lightning bug and make the son-of-a-bitch swim the Trinity up to his ears." Deceased then left, going towards Hyam's drug store on Jefferson Street, over which defendant then had a room.

E. F. Gates testified for the defense that he was a policeman of the city of Dallas in the winter of 1888–89, the Young Street neighborhood being a part of his beat. Several weeks prior to the homicide the witness, while standing on his beat opposite Dolly Love's house, saw the deceased break down the front door, enter, and knock Dolly Love down as she met him. The woman called for the police and the witness repaired to her house at once. As he entered the house he met deceased coming out. Deceased said to witness, "They want you in there." Witness replied, "I want you; I saw you knock that woman down." Witness then arrested and jailed deceased. About an hour later the witness saw deceased at Love's fence talking to her, a reconciliation having apparently been effected. Witness thereupon ordered Policeman Ahern to take deceased back to the jail. Soon after deceased was arrested the second time the defendant came out of Dolly Love's house. The witness, when he arrested deceased the first time, did not know that defendant was in the house. Witness

and defendant then went to the calaboose, arriving just as deceased was being locked up. Deceased, speaking in a vicious and sarcastic manner to defendant, said, "All right, Tom; I am much obliged to you; this is your work." Witness told deceased that it was by his, witness's, order that he was to be locked up; that he was under arrest for assaulting a woman, and that Tom Angus had nothing whatever to do with his arrest.

Wylie Kimbrough testified for the defense that during the winter of 1888–89 he was employed as porter at the saloon and restaurant of Purdy & Randell. He often served supper to the defendant and Dolly Love in the upstair rooms. The witness well remembered a certain Sunday evening in 1888 not long before the killing of deceased. He served supper to defendant and Dolly Love about 6 o'clock on that evening, and went off watch, being relieved by Bass Carr. While defendant and Dolly Love were still at supper upstairs, the deceased came into the wash room where the witness and Carr were and said to the latter, "Hello, Bass, old boy, I am here again." Carr replied, "Yes, sir, I see you are." Deceased said, "I am all right now; I was not fixed the other night, but I am fixed for him now." Deceased then exhibited a white-handled pistol, and said, "You see this, Bass?" Carr replied, "Yes, sir." Deceased put the pistol in his overcoat pocket and asked Carr, "Where are they now? Are they upstairs?" Carr replied that he thought they were. Deceased went out of the wash room, and witness went upstairs to bring down the dishes. En route he met defendant passing hastily through the side door, downstairs, and out of the house by the back way. When he got upstairs he heard deceased and Dolly Love in the room recently occupied by defendant and the woman. They were talking loud and quarreling. Deceased appeared to be drinking on that night.

Bass Carr, for the defense, referring to the same transaction about which Kimbrough testified, stated that when deceased accosted him in the wash room he said, "Hello, Bass, old boy, how are you getting along? Who is upstairs?" Witness replied that the defendant and Dolly Love were upstairs. Deceased said: "If that is the case I will go up and run him down. God damn you, you know what kind of a fellow I am." The witness then went up stairs to serve an order, and when he came down the deceased went up. Soon afterwards the witness went back upstairs, and on the way met the defendant at the lunch counter, going out. A few minutes later the witness saw deceased sitting at the table with Dolly Love eating the supper that defendant had ordered and paid for. Deceased afterwards left, and about thirty minutes later defendant came back and escorted Dolly Love from the saloon. As the witness understood this transaction it amounted to nothing less than the deceased running the defendant out of the supper room, and eating the supper that defendant had ordered and paid for.

Henry Thatcher, an employe of Purdy & Randell, testified for the de-

fense that the defendant came to that establishment on the Sunday evening preceding the homicide and ordered supper for two. Witness understood that the defendant's companion on that occasion was Dolly Love, but he did not see her. While the supper was being served upstairs the deceased, in company with a man named Grefe, came into the saloon and called for drinks. Having taken the drinks, deceased asked if witness had seen Angus that night. Witness replied that he had, and deceased asked if he was then upstairs. Witness replied that he did not know, and deceased said, "I understand that he has ordered supper for himself and Dolly Love. I am going upstairs, and I will make the son-of-a-bitch jump through the transom and eat that supper myself." He then left, and about five minutes later defendant came downstairs, paid for the supper, and left. Fifteen minutes later the deceased came downstairs, ordered drinks, and said, "I helped the son-of-a-bitch eat his supper." He then pulled out a pistol and showed it to witness. Witness advised him to put it way. He declined, saying that he was "going out after the son-of-a-bitch;" that if Angus "had not left he would have made him jump over the transom," and that he was "going out after him and have some more fun out of him." His tone of voice was spiteful, and the witness understood him to mean every word he said.

I. N. Cowan testified for the defense that he was a policeman of Dallas. Witness went with the witness Turnelle to Dolly Love's house on the night referred to by Turnelle in response to a police whistle. He found deceased, Dolly Love, another woman, and a little girl at the house, all seemingly much excited. Deceased and Dolly Love both said that defendant had been there. Deceased said that if he had arrived a little sooner he would have shot defendant for peeping in at Dolly's window, his purpose being, the deceased declared, to kill Dolly Love. He then said that if he ever caught defendant about that house again he would shoot him too full of holes to be patched up by forty doctors. The witness saw the defendant the next morning and told him what occurred at Love's; that they accused him of peeping in at Dolly's window; informed him of deceased's threats, and advised him to "look out," for Bradley had once shot a Dutchman in the back and might shoot him.

M. E. Mulvey, bartender in Swope & Mangold's saloon, testified for the defense that there were five openings to the retail or saloon department, three doors being on Main Street and two on Austin. The middle door and one half of the west door on Main Street were closed at the time of the homicide. The remaining door on Main Street, and the two doors on Austin Street were open. View into the saloon from the outside was obstructed by boxes and barrels. Deceased and Butts, *alias* Grefe, came into the saloon between 10 and 11 o'clock on the fatal morning. Butts took a drink but deceased did not. Soon afterwards deceased started towards Main Street and left the saloon by one or the other of the open

·doors, but witness could not say which.  He, however, could not more than have reached the sidewalk when the firing commenced.  No words were spoken just before the shooting that witness heard.  Neither defendant nor Dick Johnson had been in the saloon on that morning.  The defendant came to the saloon regularly for his morning drink—sometimes early, sometimes late.

Deceased and Dick Johnson came into the saloon together, or at nearly the same time, about three weeks before the homicide.  The witness's attention to their conversation was attracted by the deceased speaking of the defendant, who was not present, as a "son-of-a-bitch."  Johnson said to deceased in reply, "If you knew the man as well as I do you would not talk about him that way."  Deceased replied, "I will fight him, the son-of-a-bitch!  I will make him jump through the side of a building; if I get a chance I will do up the son-of-a-bitch; I have given him a chance to fight, but he is a coward and wont fight."  On the day before the killing the defendant and the deceased came to the bar in the ·saloon at nearly the same time, defendant entering at the front and deceased at the rear door.  They stood at opposite ends of the counter, and watched each other through the mirror.  Neither spoke, but both appeared uneasy, defendant turning a little pale.  Bradley soon left the saloon, passing the defendant, who stepped around the elbow of the counter.

S. R. Johnson was the next and the principal witness for the defense. He testified that he was a hack driver by occupation, and at and for some time previous to the homicide was driving one of the defendant's hacks. He became acquainted with deceased about three months before the killing.  He knew that defendant and deceased were not friends.  The latter on two occasions, when speaking of the defendant to the witness, exhibited a pistol.  In a conversation in Swope & Mangold's saloon three or four weeks before the killing deceased told the witness that defendant would not fight; that he had tried but could not make the defendant fight; that defendant was a coward, and that he would have to kill defendant like a dog.  He never spoke to the witness of the defendant except as a "cur" or a "son-of-a-bitch."  On the Monday before the killing the witness met the deceased, and the deceased said to witness, "I hear that Angus and Dolly Love have married, but I want you to tell Angus that married or not married to him, I am going to sleep with Dolly Love once a week." On the same occasion he told witness that Officer Gates arrested him on the night before, and that he threw away his pistol to keep it from being found on his person, but that he had another, which he exhibited to witness, with which he said he would kill the son-of-a-bitch the very first time he met him.  This was the last time witness saw deceased before the homicide.

Witness went to town about 9 o'clock on the morning of the homicide

and ordered breakfast at Purdy & Randell's saloon. He then observed the defendant across the street and called to him. They met at a point about twenty feet from the Cabinet Saloon. Witness invited defendant to join him at breakfast, and the two started to Swope & Mangold's saloon to get a drink, it being the defendant's habit to take his morning drink at that saloon. Just as the witness and defendant were in the act of stepping on the sidewalk deceased came out of Swope & Mangold's saloon at the first side door on Austin Street. As he stepped out of the door the deceased suddenly threw his hand behind him as if to draw a pistol. Witness exclaimed, "Look out, Tom!" jumped between defendant and deceased, and thence ran to the door, which he reached just as the first shot was fired. The witness saw the parties between the first and second shots, at which time deceased was in front of and a little east of the defendant. Defendant was near enough the deceased at the first shot to touch him with his pistol. Deceased, immediately after the first shot was fired, exclaimed "Oh! Oh!" and ran across the street. His right side was towards defendant at the time he started to run. Deceased was stepping out of the saloon door when defendant and witness mounted the sidewalk. He then walked straight towards defendant looking full at him. Defendant must have seen deceased as soon as the witness did. He "went" for his pistol as soon as witness exclaimed "Look out, Tom!" The witness at no time exclaimed, "Give it to him! Give it to the son-of-a-bitch!" Before the first shot he called to defendant to "look out," and after the second shot he said to defendant, "Stop, Tom." It was admitted that this witness had been tried as a party to the murder of Bradley and acquitted. The defense closed.

Willis Jenkins testified for the State that on two occasions recently before the homicide he came into sudden contact with the defendant, on each of which occasions defendant drew his pistol and attempted to kill witness. It was shown that, apologizing for these demonstrations afterwards, the defendant explained that he took the witness Jenkins to be the deceased, and drew his pistol on him believing him to be the deceased.

*Crawford* and *Kearby* and *Seay,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—1. No error is shown by the first bill of exceptions. No part of the excluded testimony related to or was connected with evidence elicited or drawn out by the State. Defendant was allowed to prove the antecedent acts and declarations of Bradley fully. What he himself said and did about such acts and declarations was not admissible as *res gestæ,* as they could not in any manner illustrate, nor were they concomitants or necessary incidents either of Bradley's acts or

of the killing—the litigated act. Wharton's Cr. Ev., sec. 263. It was not necessary to show the condition of defendant's mind at the time the acts and declarations of Bradley spoken of were made, and his statements to third parties were not admissible to prove the condition of his mind at that time. But the court did allow him to prove that "he seemed uneasy and afraid to stay there." Deceased was not present at the time the statements and acts sought to be proved were made and done by defendant.

2. As to the second bill of exception, all of the testimony of the witness Cowan was drawn out by defendant. What Cowan said to and told the defendant as to the threats was admitted. What defendant said to Cowan upon being told of the threats was properly excluded, because it could in no manner illustrate the threats.

The third bill of exception is in precisely the same attitude as the second. What defendant said to Johnson about the threats communicated by this witness was properly excluded. The State drew out no fact from Johnson relative to said threats nor defendant's reply thereto.

It was perfectly legitimate and admissible for the State to show that defendant had on the two occasions referred to drawn his pistol and attempted to shoot Jenkins, having on both occasions mistaken Jenkins for Bradley. This testimony showed his animus towards Bradley and his determination to kill him. It evidenced the malice he bore Bradley. His apology to Jenkins and his admissions that he mistook Jenkins for Bradley were legitimate to show his animus, and that it was intended and directed toward Bradley and not Jenkins, and that his apparent hostility towards Jenkins was because of his mistaken identity for Bradley. Part of the testimony objected to was elicited on cross-examination by defendant.

The fifth bill was saved to the refusal of the court to give certain special requested instructions asked for by defendant. They show no error. The law of the case was most fully, clearly, and pertinently presented upon every legitimate phase of the defensive testimony in the admirable charge of the court as given to the jury, and the special instructions were properly refused. Taken as a whole, no sound or valid objection can be urged or shown to the charge.

No charge was asked upon manslaughter, nor was the court's failure to so charge excepted to. Its omission in this particular is first complained of in the motion for new trial.

In the brief filed in this case on appeal the learned counsel, on page 9, say: "The offense charged was murder; the defense was justifiable homicide under article 572." Such is the case as we understand it from the record. Such was the case as understood by the learned trial judge as well as the parties; and such was the case which he submitted to the

jury in the charge.   There was no manslaughter in this case.   It was plainly murder or self-defense.

Defendant was found guilty of murder of the second degree, and his punishment assessed at only five years in the penitentiary.   We think he has reason to congratulate himself upon the mildness of his punishment.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.