State's witness Morgan that at the time the hogs were killed as testified by said witness they were destroying his, defendant's, corn in defendant's field, and the court refused to allow him to make said proof. Defendant also proposed to prove by said witness that at the time said hogs were killed as aforesaid in defendant's enclosure said enclosure was surrounded with a good fence, which latter testimony was objected to by the State upon the ground that the enclosure, when the hogs were killed, was in a subdivision of the county in which the hog law was in force; and this objection was sustained and the evidence excluded.

---

## J. R. AND ERWIN FLOYD v. THE STATE.

*No. 3045.    Decided January 31.*

**1. Manslaughter.**—The evidence does not present the issue of manslaughter, and it was not error to refuse to submit such issue and instructions thereon to the jury.

**2. Principal Offender.**—It requires more than the bare presence of a party at the time and place of the commission of an offense to constitute him a principal offender. There must be an acting together with the person who actually commits the offense. Mere concealment of the knowledge that the offense is to be committed, or a mere tacit acquiescence in the commission of the offense, or words which amount to a bare permission to commit the offense, will not be sufficient.

**3. Impeaching Testimony.**—Testimony introduced to impeach the credibility of a witness can be considered for that purpose only, and can not be regarded as evidence of the defendant's guilt.

**4. Murder.**—Evidence held insufficient to support a conviction of murder as to one, but sufficient as to the other defendant.

APPEAL from the District Court of Navarro. Tried below before Hon. Rufus Hardy.

J. R. Floyd and Erwin Floyd were jointly indicted, tried, and convicted for the murder of Frank Patterson. The conviction is for murder in the second degree, the punishment assessed being confinement in the penitentiary for twenty-five years against each of them.

Mrs. Patterson, widow of deceased, witness for the State, testified that her husband, Frank Patterson, was killed on the 18th day of September,

1890, in Navarro County, by Erwin Floyd and his father, J. R. Floyd. "It is 137 steps from my house to Floyd's house. The public road runs between Floyd's house and our farm. Deceased had just left home on horseback to go to his work. I stepped out on the gallery and saw Floyd's women standing on his gallery, and the door to their house was shut. I saw the door of Floyd's house open, and both the defendants appeared in the door with a gun, but can not say which one had the gun. I saw deceased shrug or sorter jerk up his shoulder, and then heard the report of the gun. It fired twice in quick succession. I believe it was old man Floyd that did the shooting. I think the killing was between 7 and 8 o'clock a. m. It was 32 or 33 steps from where deceased was shot to where he fell off his horse. From Floyd's house to the road is 33 steps. When deceased was shot his gun was lying across his lap and his hands were down. He was 49 years old. The evening before the killing I saw old man Floyd shooting a Winchester at a spot on a mesquite tree. He shot six or seven times. He was at the time at home alone; his family were picking cotton. That evening he went down toward the ravine in the road, the way deceased had to come home from his work. He went down there with his gun three times, about 2 o'clock. I saw him late on the same evening sitting on his gallery with his gun in his lap. Deceased came home that evening about dark, and Mr. Ike Boyd came with him. On the morning before the day of the killing, while deceased was in the road near the ravine, going to his work, the defendants both went out in the road and got after him. The old man had a gun. I do not know that Erwin had anything. I know they stopped deceased, for I could see them until they all got down in the ravine. I heard deceased say to them, "If you will put down that gun I will fight both of you, but I've got no weapon." Deceased started back home, and old man Floyd raised his gun and made him go back the other way. I don't know anything about deceased buying cartridges. I suppose his gun was loaded, but don't know. Deceased never shot at Floyd's house at any time, and never said he was going down there to kill Floyd. I never said, "Go on, I will swear for you as long as I can stand up." Deceased did not shoot from home towards Floyd's house the day he was killed. Deceased was mild spoken, but would raise his voice when angry, like any other man. Deceased never said a word to me against the Floyds. He told me all about the fuss that occurred on the day before he was killed. I never heard him make any threats against the Floyds."

John Boyd, witness for the State, testified: John and Joe Patterson, sons of the deceased, and myself reached the body of deceased together. His dead body was lying across the road and on the stock of his gun. His gun was not cocked. The hammer was down. Think it was a Winchester gun. It was 32 steps from Floyd's house to where deceased was shot. It is 137 steps from Floyd's to deceased's house. I heard two guns

that morning and saw smoke. The evening before, between 2 and 4 o'clock, heard eight or ten shots in direction of Floyd's house.

Cross-examined: Deceased was a good man, but was on his muscle, and if you got the best of him you just had to go for him with a gun, for he would go for you if you went for him. I examined mesquite tree near Floyd's house and found no marks. Four or five days before deceased was killed he said he was "going to whip the d—d outfit." Defendants' reputation for peace and quiet is good. The muzzle of deceased's gun, as it lay under his dead body, was pointed in the opposite direction from Floyd's house.

Isaac Boyd, Jr., witness for the State, testified: Saw dead body of the deceased in the road. Saw a wound in the body made by a ball. The ball penetrated and broke the left arm near the shoulder and penetrated the body, lodging on the opposite side. This wound caused the death of the deceased.

Ike Boyd, witness for the State, testified: I saw old man Floyd the day before the killing. He said deceased came to his house and raised a fuss with Erwin, and threatened to get his gun and fix him, and he made deceased go back the other way; that deceased said if he, Floyd, would lay his gun down he would whip us both; that he laid it down, and deceased would not fight. He said also that deceased could not go by his, Floyd's, house with a gun. I saw deceased the evening before he was killed. He had a Winchester and belt of cartridges. Old man Floyd said deceased was a coward. I replied I believed he was, because my brother had rubbed his fist in his face and he would not resent it. I told Floyd that deceased was a kind of overbearing man.

John Patterson, witness for the State, testified substantially as did the witness John Boyd as to the position of the dead body and the gun.

Tom Hill, witness for the State, testified that a few days before the killing old man Floyd said that deceased was a man of no principle, and that things had come to such a pass that he, Floyd, would have to do something, and if he did he would do it in good shape. Witness stated that the reputation of deceased for peace and quiet was good.

Cross-examined: Old man Floyd said that deceased's hogs had been rooting up his potato patch, and he could not get him to put them up; that he, Floyd, had made a pen, and expected to have to put them up himself. Deceased was a fist-fighter, and would fight when crossed.

Major Weaver, witness for the State, testified: Deceased's reputation for peace and quiet was good. He never used weapons, but would fight with his fists if run on. Deceased came to me the day before he was killed and asked my advice about what to do about the Floyds. I advised him, and he went and got a peace warrant for the Floyds.

A. B. Taylor, witness for the State, testified that between 3 and 4 o'clock he heard about eight shots in the direction of Floyd's house, which he

took to be Winchester shots; that he was distant from the shots about one-fourth of a mile.  He does not state the day when he heard the shots.

Frank Floyd, son of defendant J. R. Floyd, and brother of defendant Erwin Floyd, witness for the defendants, testified that deceased, the day before he was killed, cursed Erwin Floyd and said to him, "I'll fix you," and rode off towards his, deceased's, house, got his gun, and rode by Floyd's house, up and down the road all day, and kept pointing the gun at the house and at any of the Floyds he might see.  "I met him in the road once on that day half a mile from our house, and he raised his gun, but don't know that he pointed it at me.  I heard him shoot his gun after he got it at his house."

Cross-examined: I went to where deceased and brother Erwin were quarreling.  As father was coming from his house with his gun deceased said, "If you will lay your gun down I will whip you and your son both." Father laid down his gun about twenty steps from the house and came on, and deceased pulled off his coat and vest and commenced quarreling, then got on his horse and rode off. . On the afternoon before the killing brother and I were picking cotton 300 or 400 yards from father's house, and I heard no firing that evening in the direction of the house.

Mrs. O. Floyd, wife of J. R. and mother of Erwin Floyd, witness for defendants, testified: The origin of the trouble between the Floyds and deceased was that my husband told deceased to put up his pigs that were rooting up defendant's potatoes.  The day before the killing deceased overtook Erwin Floyd as he, Floyd, was going to the cotton patch, and cursed him, and started back to his, deceased's, house, saying, "I will fix you."  When deceased got opposite our house my husband told him if he was going after his gun he could not go.  Deceased said he would get his gun and kill them both.  My husband had his gun.  Deceased turned back and said, "If you will lay down your gun I will whip you both." My husband laid down his gun and started to where deceased was.  De-- ceased got off his horse, pulled off his coat and vest and put them on again, and got on his horse and went off.  My husband shortly after got his gun and went off.  That same morning, after my husband had left, deceased fired his gun from his gallery and the ball passed close enough for me to hear it.  I heard deceased's wife say "Kill them both; I will swear for you as long as I can stand up."  About 12 o'clock the same day I saw my husband coming home at a fast gait, with his gun, and deceased some eighty yards behind him, coming as fast as he could, with his gun.  My husband rode up to the gallery, put his gun on the gallery, and squatted down behind his horse.  Deceased came by soon after and went by his home, riding fast.  Next morning I saw deceased down the road with his gun.  When he got near our house he pointed the gun towards the house, at Erwin, and I told him to quit pointing the gun that way, and he said he would point it where he d—d pleased.  Erwin

heard him, and went and got his gun, and as deceased was pointing his gun to shoot Erwin, he, Erwin, fired at deceased twice in quick succession. I think the first shot hit deceased. Deceased turned back into the road, and rode on down to the ravine out of my sight. I saw deceased when he left home. He was cursing, and I went out to talk to him. My husband was in the house. Deceased had his gun raised and pointed at the house as if to shoot when the gun first fired. He kept trying to raise the gun after he was shot. Erwin was sitting just inside the door when deceased raised the gun and cursed. He got his gun and got out on the gallery, and shot twice, as quick as he could. When deceased was pointing his gun as above stated he was facing our house, and was not more than twenty steps from the door and was coming towards the house. My husband is 66 years old and my son Erwin is 19 years old.

Etta Floyd, daughter of J. R. and sister of Erwin Floyd, witness for defendants, testified: On the morning of the killing I saw deceased near our house. When he got in front of our house he pointed his gun towards the house at Erwin, and mother told him not to do so. He said he would point where he d—d pleased. Erwin got his gun and shot deceased while deceased was pointing his gun to shoot. I don't know whether I went to Thrailkill's house the morning after the killing or not. Don't recollect what I said there, if I was there. I was frightened that morning. I did not say at Mr. Thrailkill's to Mrs. Thrailkill, Mrs. Garnet, and Mrs. Taylor that we took the gun away from Erwin when we saw deceased coming from home, to keep brother from shooting, and if father had not taken the gun from us and given it back to Erwin deceased would not have been killed.

James Bunch, witness for defendants, testified: I saw deceased the evening before he was killed. He told me they (did not say who) made him look down a Winchester, and that he would mix it with them if they did it again; said he was fixed, and showed me his gun and belt of cartridges.

John Jackson, witness for defendants, testified: Deceased told me the day before he was killed that he had been abused as long as he was going to be; that he had tried to catch up with old man Floyd that day and settle it with him. He said Floyd knew better than to put up his hogs. He said he wanted to drop the trouble but feared he had gone too far, as he had got out a peace warrant to put the old man under bond.

R. S. Layman, witness for defendants, testified: I saw deceased three or four days before he was killed. He told me he had had a difficulty with the Floyds, and had to look down the muzzle of a gun, and that he was going by Floyd's house and kill the first damned man that stuck his head out.

L. J. Harris, witness for defendants, testified: I saw deceased the day before he was killed. He had on a belt of cartridges. I asked him what

he was going to do with it.   He said those fellows had drawn their guns on him, but were too cowardly to use them; G—d d—n them, he would be ready for them next time.   He said he met them in the road that morning and the old man cut him off from home and drew his gun on him, and he tried to get them to fight him fair and lay down the gun, but they would not fight. .

D. H. Williams, witness for defendants, testified:  The day before deceased was killed he said he had had a fuss with the Floyds; that they drew a Winchester on him and forced him to look down it.   He put his hand in his pocket and pulled out some cartridges and said this was the first time he had ever bought lead for any man, and had got this for old man Floyd.

J. R. Floyd, one of the defendants, witness for defendants, testified: On the day before the killing Erwin Floyd was going to the cotton patch. Deceased overtook him.   I was at the house.   They were down the road about seventy-five yards from me.   I heard deceased say, "God d—n you, I will fix you," and he got on his horse and started to his house.   I heard him cursing and abusing Erwin, and Erwin did not say anything that I could hear.   Don't think he offered to fight.   I got my gun and went out and stopped him with my gun, and told him he could not go after his gun, and he said, "I will go and get it and kill both of you."   I made him go back the other way.   He told me if I would lay down my gun he would whip us both.   I laid down my gun in the weeds about twenty feet from the house and went up to him and told him he lied, and he told me I was a d—d liar, and repeated it several times, and got on his horse and rode off.   Witness corroborated the witness Mrs. Floyd as to the killing, and as to his being chased home by deceased on the day before the killing, and further stated with reference to the killing:  "When deceased pointed the gun I called to my wife and daughter to come into the house.   He had his gun presented and pointing towards the house, and I was afraid he would kill some of them.   Erwin fired very quick, twice.   I don't know which way deceased was facing when he pointed the gun.   I saw him, but don't know whether the horse he was riding was moving or had stopped.   I don't know whether he was in the road or coming towards our house when he was presenting his gun.   I don't know whether he ever got out of the road or not."

Several witnesses for the defendants testified that the reputation of defendants for peace and quiet was good, and that deceased was a man who would fight, and was a bad man for fighting when under the influence of liquor.

A. B. Taylor, witness for the State, testified:  About an hour after the killing Miss Etta Floyd was in a room at Thrailkill's house, talking to Mrs. Thrailkill and Mrs. Boyd.   I heard her say on that occasion that they took the gun from her brother to keep him from killing deceased before

he got close to the house, and if her father had not taken it from them and given it back to her brother deceased would not have been killed.

W. A. Garnet, witness for the State, testified that shortly after the killing he saw Miss Etta Floyd with Mrs. Thrailkill, going to Mrs. Thrailkill's house. They were inside the gate when he saw them.

Several witnesses for the State testified that the reputation of defendants' witness R. S. Latham for truth and veracity was bad.

The charge of the court submitted to the jury the issues of murder in the first and second degrees and of self-defense, but did not submit the issue of manslaughter. Defendants requested instructions upon manslaughter, which the court refused, and they reserved a bill of exceptions to the charge of the court because it omitted manslaughter, and to the refusal of the court to give the requested instructions upon that issue.

*Craft & Craft,* for appellants, in support of the contention that the issue and law of manslaughter should have been submitted to the jury, cited Cochran v. The State, 28 Texas Ct. App., 422; Boyd v. The State, 28 Texas Ct. App., 137; Williams v. The State, 24 Texas Ct. App., 637; Howard v. The State, 23 Texas Ct. App., 279; Eanes v. The State, 10 Texas Ct. App., 444; Orman v. The State, 22 Texas Ct. App., 614; Penal Code, arts. 597, 598.

*W. L. Davidson,* Assistant Attorney-General, for the State, contended that the issue of manslaughter was not presented by the evidence, and cited Green v. The State, 27 Texas Ct. App., 244.

WHITE, PRESIDING JUDGE.—Appellants were jointly indicted, tried, and convicted for the murder of one Frank Patterson. They were each found guilty of murder of the second degree and the punishment of each affixed at twenty-five years imprisonment in the penitentiary. Deceased was killed in the public road whilst passing the house of appellant J. R. Floyd. He was shot with a Winchester rifle by appellant Erwin Floyd, who was at the time of the shooting inside of or upon the gallery of his father's house. Appellant J. R. Floyd and deceased had had several previous altercations and were carrying their guns for each other.

But one bill of exceptions is contained in the record, and that was saved to the omission of the court to charge and the refusal of the court to give defendants' special requested instruction upon manslaughter. There was no error in refusing to submit the law of manslaughter in this case. As aptly said by the Assistant Attorney-General in his brief in this case: "There are but two theories in this case—one of murder and the other of self-defense, with serious questions as to the latter being in the case. Defendants either shot deceased as he was going along the road and without cause, or they shot him for pointing his gun at the house or the peo-

ple therein. In the one instance it was murder; in the other the law of self-defense was invoked and given by the court." Green v. The State, 27 Texas Ct. App., 244.

As stated above, the evidence shows that the killing was done by Erwin Floyd. J. R. Floyd, the father, was in the house at the time, but did not shoot, nor is there any testimony whatever going to show that at the time Erwin shot he, the said J. R. Floyd, was aiding or encouraging him in any manner, either by words or acts, in the shooting.

As to appellant Erwin Floyd, we have been unable to find any reversible error in the record of his conviction, and consequently the judgment as to him will be affirmed.

As to appellant J. R. Floyd, in our opinion the evidence is insufficient to support the verdict and judgment. It is true he, equally with Erwin, had had previous serious personal difficulties with deceased; had drawn his gun upon deceased and threatened his life; had been chased home by the deceased only the day before, both parties being armed with Winchesters. Still at the time of the killing the evidence fails to show that he was in any way any further than as above stated a party or consenting to it than the fact that he was present in the house.

Under our statutes it requires more than the bare presence of a party to constitute him a principal offender. Penal Code, arts. 74, 75, *et seq.* There must be an acting together. "Concealment of the knowledge that a felony is to be committed will not make the party concealing it an accessory before the fact, nor will a tacit acquiescence, or words which amount to a bare permission, be sufficient to constitute this offense." Noftsinger v. The State, 7 Texas Ct. App., 302; Smith v. The State, 23 Texas Ct. App., 358.

Notwithstanding his previous personal difficulties with deceased, appellant J. R. Floyd may never have intended to kill him, and if he ever had, may have abandoned such intention; and he may never have consented to, much less aided and encouraged Erwin in this killing. If not, then he is not in law and can not in reason or justice be held guilty of the murder.

It is true that the State impeached defendants' witness Etta Floyd with regard to his, defendant J. R. Floyd's, actions and conduct on the occasion of the killing, by proving that she, the witness, on the morning of the killing went to the house of one Thrailkill and there in the presence of several parties stated, "We took the gun away from Erwin when we saw Patterson coming from home, to keep brother from shooting; and if pa had not taken the gun from us and given it back to Erwin, Patterson would not have been killed." She denied that she had made this statement, and the prosecution proved that she had made it. The prosecution did not prove that the statement was true, but only that the witness had made it. Such proof on the part of the State could only affect the credibility of the witness. It was not evidence of the guilt of the defendant.

Aside from this impeaching testimony, we have found in the record no evidence connecting the appellant J. R. Floyd directly with the act and fact of the killing, and the evidence of his complicity in the killing is wholly insufficient to warrant the verdict and judgment against him, wherefore the same is reversed, and as to him the case is remanded for another trial.

*Affirmed as to appellant Erwin Floyd.*

*Reversed and remanded as to appellant J. R. Floyd.*

Willson, J., absent.