## A. B. SUMMERS V. THE STATE.

### No. 1372.   Decided May 22, 1912.

**1.—Murder—Charge of Court—General Objections.**

Where the objections to the charge of the court are of a general character, they can not be reviewed on appeal.

**2.—Same—Charge of Court—General Objections—Manslaughter.**

An objection, that the court erred in failing to charge the jury on the law of manslaughter and in not submitting to them that issue under the facts of the case, is too general to require a review on appeal. Following Mansfield v. State, 62 Texas Crim. Rep., 631, and other cases. Davidson, Presiding Judge, dissenting.

**3.—Same—Case—Practice on Appeal.**

Where the objection to the court's charge was that he failed to charge on manslaughter, and the statement of facts contained ninety-six full type-written pages, this court can not be required to hunt out from this mass of testimony whether or not manslaughter is in the case.

**4.—Same—Slight Evidence of Manslaughter—Charge of Court.**

Where, upon appeal from a conviction of murder in the second degree, it appeared from the record that the very most that could be claimed was a very slight suggestion of some fact that might show manslaughter, and there was no pertinent evidence thereof, the court was not required to charge upon manslaughter. Following Davis v. State, 28 Texas Crim. App., 560, and other cases. Davidson, Presiding Judge, dissenting.

**5.—Same—Charge of Court—Manslaughter.**

Where the evidence on the one hand clearly showed murder, and on the other perfect self-defense, the court was not required to charge on manslaughter. Following Homberg v. State, 12 Texas Crim. App., 1, and other cases.

**6.—Same—Charge of Court—Self-Defense—Reasonable Force.**

Where, upon trial of murder, the court in his charge on self-defense, in one paragraph thereof, instructed the jury that the defendant was permitted to defend himself, etc., and to use all the necessary and reasonable force to

do so, but no more than the circumstances reasonably indicated to be necessary, and in subsequent paragraphs of his charge correctly submitted the law of self-defense without any qualifications, there was no reversible error, under Article 723, Code Criminal Procedure. Davidson, Presiding Judge, dissenting.

### 7.—Same—Charge of Court—Uncommunicated Threats.

Where, upon trial of murder, the evidence showed that defendant had absolute knowledge of all the threats made against him by the deceased whether communicated or not, and the jury had the full benefit of this testimony and could not have been misled by the court's failure to charge on uncommunicated threats even if there were any, there was no reversible error. Davidson, Presiding Judge, dissenting.

### 8.—Same—Charge of Court—Uncommunicated Threats—Article 723.

Where, upon trial of murder, the testimony on the question of uncommunicated threats was weak, trivial, light and remote, there was no error, under Article 723, Code Criminal Procedure, in the court's failure to charge thereon. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Hardin. Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Jno. L. Little,* for appellant.—Cited cases in the minority opinion.

On the question of the court's failure to charge on manslaughter: McLaughlin v. State, 10 Texas Crim. App., 340; Neyland v. State, 13 id., 536; Rutherford v. State, 15 id., 236; Hobbs v. State, 16 id., 517; Jones v. State, 15 S. W. Rep., 403; Tow v. State, 22 Texas Crim. App., 175; Howard v. State, 51 S. W. Rep., 231; Swain v. State, 86 S. W. Rep., 335.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—On October 2, 1908, appellant was indicted for the murder of R. H. Hague on May 11, 1908. He was tried in April, 1911, convicted of murder in the second degree and given five years in the penitentiary—the lowest penalty.

The evidence is quite lengthy. It is unnecessary to give an extended statement of it.

There are several objections by appellant in his motion for new trial to the charge of the court. Most of these are too general to require a review by this court. In some, minor matters are complained of, but when the charge, taken as a whole, which must be done, is considered, these complaints are without merit. There are some three questions, however, which it is necessary to discuss.

One of these is, he complains, "the court erred in failing to charge the jury on the law of manslaughter and in not submitting to them that issue under the facts of the case." Clearly this is too general to require this court to consider the question. Mansfield v. State, 62 Texas Crim. Rep., 631, 138 S. W. Rep., 591; Luster v. State, 63 Texas Crim. Rep., 541, 141 S. W. Rep., 214; Ryan v. State, 64 Texas Crim.

Rep., 628, 142 S. W. Rep., 883; Berg v. State, 64 Texas Crim. Rep., 612, 142 S. W. Rep., 886, and the authorities cited in these cases. This court, through Presiding Judge Davidson, in the case of Mansfield, supra, said:

"Appellant contends, in a general way, that the court erred in not charging the law of manslaughter. The exception in the record presenting this matter is found in the motion for new trial in the following language: 'The court should have charged on manslaughter.' This is found at the close of the second paragraph of the motion for new trial, and then in the third ground of the motion it is stated the court should have given a correct charge to the jury, as raised by the testimony of defendant, concerning the alleged insulting note which was carried to defendant's wife by deceased Thomas, knowledge of which was conveyed to defendant on the evening before the homicide, and which, if believed by the jury, would reduce the homicide to manslaughter. The extract from the ground of the motion is not sufficient to present the failure of the court to charge on manslaughter. It is too general."

The application of this rule is manifest in this case. The statement of facts contains 96 full typewritten pages. This court should not be required to hunt out from this mass of testimony whether or not manslaughter is raised. The assignment should directly and specifically show in what way and how the evidence called for any such charge if it did.

Even if we could consider the question, after reading and studying the whole statement of facts, we have been unable to find any *pertinent* or *forcible* evidence from which it might reasonably be supposed that the jury could have been influenced by it to find manslaughter in arriving at their verdict. The very most that could be claimed from any of the testimony, is the very slightest suggestion or hint of some fact that might be tortured into tending to show manslaughter. Certainly the evidence in no *pertinent* or *forcible* way suggests manslaughter sufficient to authorize the court to submit it. Bishop v. State, 43 Texas, 390.; Davis v. State, 28 Texas Crim. App., 560; Maxwell v. State, 31 Texas Crim. Rep., 144; Cannon v. State, 41 Texas Crim. Rep., 490; Nevarro v. State, 43 S. W. Rep., 106; Alexander v. State, 63 Texas Crim. Rep., 102, 138 S. W. Rep., 738; Mitchell v. State, 64 Texas Crim. Rep., 545, 144 S. W. Rep., 1014; Treadway v. State, 64 Texas Crim. Rep., 208, 144 S. W. Rep., 668; Jennings v. State, 60 Texas Crim. Rep., 421; Blount v. State, 58 Texas Crim. Rep., 510; Dougherty v. State, 59 Texas Crim. Rep., 464; Potts v. State, 56 Texas Crim. Rep., 44; Ford v. State, 40 Texas Crim. Rep., 280.

In the case of Davis v. State, supra, this court, through Judge Hurt, said:

"Of what degree of force must the evidence be that tends to establish an offense, or tends to mitigate the offense charged, in order to require a charge applicable thereto? Chief Justice Roberts says that if its force is deemed to be very weak, trivial, or light, and its appli-

cation remote, 'the court is not required to give a charge upon it.' 'If, on the other hand, it is so pertinent and favorable as that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, the court should charge so as to furnish them with the appropriate rule of law upon the subject.' Bishop v. State, 43 Texas, 390. Hence, unless the evidence tending to present a less degree of an offense, or any theory of defense, be so pertinent and forcible that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, a failure of the court to charge thereon would not be ground for reversal in the absence of exceptions. This position is in exact harmony with the first opinion in this case, and in accord with Bishop's case, supra, and a number of cases decided by this court, notably Cunningham's case, 17 Texas Crim. App., 89 Elam's case, 16 Texas Crim. App., 34, and Leeper's case (27 Texas Crim. App., 694, 11 S. W., 644). Loose expressions upon this subject can be found in the opinions of this court, but the principle is well settled and is absolutely correct, whether this court has always adhered to it or not, that in the absence of exceptions to the charge of the court, for this court to reverse, the evidence tending to present a phase of the case or theory favorable to the accused must be so pertinent and favorable that it might reasonably—not possibly—be supposed that the jury could be influenced by it in arriving at their verdict. Unless the evidence be of such a character no injury appears, no injury is probable— not possible, but probable—and, unless this appears, there is no ground for reversal; and to reverse in the absence of probable injury would be contrary to principle."

"It is not incumbent on the trial court, nor proper, to instruct upon manslaughter where there is no testimony, or where there is a mere suggestion or hint of facts that might show manslaughter. Such a mere semblance of proof or so slight proof as no sensible juror would hang a question upon." Wilson v. State, 60 Texas Crim. Rep., 3.

Again, it is the unquestioned law of this State that where the evidence on the one hand clearly shows murder, and on the other, perfect self-defense, the court should not charge on manslaughter. Homberg v. State, 12 Texas Crim. App., 1; Williams v. State, 2 Texas Crim. App., 287; Grissom v. State, 4 Texas Crim. App., 387; Self v. State, 28 Texas Crim. App., 409, 13 S. W., 602; Angus v. State, 29 Texas Crim. App., 62, 14 S. W. Rep., 443; Floyd v. State, 29 Texas Crim. App., 355, 16 S. W. Rep., 188; McGrath v. State, 35 Texas Crim. Rep., 413, 34 S. W. Rep., 127, 941; Lentz v. State, 48 Texas Crim. Rep., 2, 85 S. W. Rep., 1068; Jirou v. State, 53 Texas Crim. Rep., 18, 108 S. W., 655; Shelton v. State, 54 Texas Crim. Rep., 590, 114 S. W., 122; Ward v. State, 59 Texas Crim. Rep., 62, 126 S. W., 1146; Canon v. State, 59 Texas Crim. Rep., 398, 128 S. W. Rep., 146; Dougherty y. State, 59 Texas Crim. Rep., 464, 128 S. W. Rep., 401; Jennings v. State, 60 Texas Crim. Rep., 421, 132 S. W. Rep., 473; Hardcastle v. State, 36 Texas Crim. Rep., 562, 38 S. W. Rep., 186; Eggleston

v. State, 59 Texas Crim. Rep., 542, 128 S. W. Rep., 1105; Alexander v. State, 63 Texas Crim. Rep., 102, 138 S. W. Rep., 722; Treadway v. State, 64 Texas Crim. Rep., 208, 144 S. W. Rep., 667.

Unquestionably the evidence in this case shows on the part of the State murder in one or the other degrees, or on the other hand, by appellant, perfect self-defense.

The testimony without doubt and overwhelmingly established that the appellant and the deceased had, in effect, been enemies for about two years; that there had been some efforts during this time to "patch up" between them, but this had failed; that a time or two a long while before the killing there had been a kind of patched up reconciliation but it was not full, on the part of either; they were in effect still enemies; the deceased had many times and to many persons threatened to kill appellant. These threats had been communicated to appellant and he had unquestionable knowledge thereof. The appellant himself testified that many persons, naming a good many, had communicated these threats to him from time to time during this whole period of two years. These threats became more frequent for a short time prior to the killing. Appellant himself testified that he expected he could call the names of thirty persons during this time who had communicated these threats to him. He showed that within about thirty minutes prior to the killing, the deceased had made such a threat against him and that it was communicated to him. He also showed by his own testimony and that of others that after he started down to the "jungles," a certain part of the town beyond where the killing occurred, and within twenty or thirty feet of the deceased's saloon, where he killed him, that he was then again warned of deceased's threats and urged not to go by the deceased's saloon, because the threats might then be executed. It was also unquestionably shown that the deceased was a violent and dangerous man and the appellant knew this and had known it for a long time. All these facts just above stated were uncontroverted by the State. The State introduced no evidence to dispute them. The testimony of the appellant's witnesses established all these facts overwhelmingly.

The appellant further, by his testimony, showed that he was drinking considerably that night just before the killing; that he had taken some five or six drinks. He denied that he was drunk; that for a long time before the killing, during the whole time of the two years of the hostilities between the appellant and the deceased, appellant had avoided deceased, would not go into any house if he knew deceased was therein; that if his duties or business carried him from one part of the town to another if he was on the side of the street where the deceased's saloon was, he would pass over on the other side of the street and on the opposite side of the street pass the appellant's saloon. However, on this night when he was called to some point in the town beyond appellant's saloon he did not go on the opposite side of the street or any other way to avoid going by deceased's saloon, although, as stated

above, informed within less than thirty minutes of the killing of the deceased's threat to kill him, and that he was seeking an opportunity to kill him, and warned by his friend when he got within twenty or thirty feet of the deceased's saloon not to pass by it because of the threats and that he (appellant) might then be killed.

The State's evidence, by several disinterested eyewitnesses, then shows this state of facts: That immediately after the warning of his friend, when within twenty or thirty feet of the deceased's saloon, he went straight to the saloon and as he sprung up on the gallery thereof he pulled his six-shooter out of the scabbard, carried it in his hand and when he got to the wide open double doors of deceased's saloon, deliberately and cooly presented his pistol and fired at the deceased, striking him in the right ear, the ball going straight into the deceased's head and that then, upon the deceased falling, he advanced towards him, shot him the next time just below the nipple while he was falling, and either after he fell or while he was continuing falling he fired a third shot into his stomach, a few inches below where the ball had entered close to the nipple, killing the deceased immediately. That the deceased did not see the appellant before, or when he first shot him, but that he was standing at his own bar with his elbows up on the bar, with his right side towards his door and appellant, his barkeeper in front of him behind the bar with his face towards the front door, with a customer a few feet from and on either side of him, a postal card in his left hand and pointing to it with his right hand and commenting thereon, and that he made no demonstration whatever in any way towards the appellant; that when the deceased was first shot by appellant he began falling and fell with his feet at or towards the bar, and his body and head directly therefrom at about right angles with the bar.

On the other hand the appellant testified to the effect that he did not pull out his pistol and hold it in his hand as he sprang on the gallery in front of appellant's saloon, but that as he got to the door the deceased "sprung from the bar, throws his hand to his pocket and I shot. I sprung from the sidewalk to the gallery in my spring. I was in my shirt sleeves. I always carried my pistol in my hip scabbard—jerked my gun and jumped and shot and slid to the door all at the same time. The first shot fired while I was in this sliding position and as my feet came in contact with the carpet strip in the bottom of the door, why I, course that checked me, but I finished shooting in the door. I never advanced no further than the door but when he fell, of course, I quit shooting, but I fired all three shots in rapid succession, just as fast as I could shoot; he got every one of them before he hit the floor and I did not shoot him after he hit the floor. . . . When I fired the first shot Hague was facing me, about five or six feet from the bar; he sprang away from the bar right out in the front, in the open front from the bar facing me. The first shot hit him right in the breast. The second shot hit him, I reckon, in the head. That is what I shot at and they told me there was a hole in the ear. The

third shot, they told me, took effect in the stomach. The first shot it knocked him around, it knocked his side to me . . . I do not know whether he ever got his hand to his pocket and do not know anything about that; I know he made a break here (witness indicating) and that is how come me to shoot . . . I knew something about his skill as a marksman; I knew that he was a crack shot with a pistol. . . . He was a crack shot and fast as lightning too. I knew I had something to do to save my hide. I knew if ever he shot at me, I was going to get hit. When I saw I was beyond danger, I ceased to shoot him. When he hit the floor after I had shot the third shot and him tumbled around and when he hit the floor I had in mind a fourth shot, but seeing him down I let the hammer down and backed to the door; the door was swinging open behind, you know, and I backed up against the door and extracted them shells and put in three more and stuck the pistol in my hip scabbard and stood against the door. I was not going to run off, but I did not know what else was going to happen; I did not know what he had there. I knew he was always framed up there and that is how come me to stand on guard that way. As to whether I was excited at the time, well, of course, judge, I do not know as I was excited, of course, I guess I was a little excited after it was all over."

On cross-examination he further testified: "Why, I would not slip upon a dog. I shot Riley Hague that night just as soon as he sprang from this bar and throws his hand down like he was going to draw his pistol—all those threats were communicated to me; certainly I shot as quick as I possibly could. I sprang from the outside of the walk to the door. That gallery is about six, seven or eight feet wide, it is hardly ten feet I don't think. As to why did I want to slide in there on him, well, I did not want to slide in on him. I sprang from the sidewalk up from this gallery to the door. I said I was in a sliding position. This break he made started that slide I made—this break he made there in front of me. As to my breaking towards him, well, there was no time to break away as that would have been the worse thing I could have done. I knew my gun was all right, I have shot and killed a deer eighty yards with a pistol. I guess I was probably fifteen feet from him when I commenced shooting. I knew my gun would kill a man that far, it did do it. As to why I wanted to slide in there on him, well, I could not see any sense in running. As to whether I did not have sense enough to stand, well, I was not going to stand and let him go to shooting. The reason why I advanced towards this man and shot at him was because I intended to kill him if I could as I saw what he was up to. I did not go up there for the purpose of killing him, if I had wanted to kill him I would have held him up like he did me. Just as soon as he made this break I pulled my gun and I did not pull it before that. No, I do not think he ever got his gun out. I did not watch his hand to see whether he got his hand in his pocket as I was watching him. It was that hand that was

scaring me so bad. As to whether I was watching it; well, I was not going to stand there and look at his hand, I saw something else to do, when I saw his move then I got to work. After I saw him throw his hand to his pocket then it was I started for my pistol. I did not start for my pistol before he threw his hand to his pocket. Then I went ahead and jerked my pistol from my scabbard and slid from the sidewalk down to the door and shot him before he ever got his hand in his pocket. I was pretty quick myself. I testified a while ago that Riley Hague was quick as lightning. If I said that it goes. If he was quick as lightning and could not do no more than I and I done all this before he done anything before, I was pretty fast myself. I know why I had a little advantage of that, he was a little bit too drunk to be as fast as he would have been if he had been sober, that is all that saved me. The reason I know he was drunk was because the people told me he was drinking that night. I am not swearing to whatever they understood; I am swearing to what I was told. As to whether that is the reason I went up there to kill him, no, sir, I did not go up there to kill him. I did not want to kill him, I tried to avoid it every way I could on earth; I never tried to waylay him like he did try to shoot me from upstairs and from behind St. Louis saloon. Just before I did the shooting not over twenty-five or thirty feet, I met a man by the name of Fielder and that fellow Fielder told me not to go up there."

Appellant also showed that deceased always went armed, carrying a pistol in his pocket, whence he attempted to place his hand and pull his pistol when he shot him, and that on this occasion he had his pistol in his pocket, and that deceased's wife at once took this pistol out of his pocket. The State controverted this evidence, and the witnesses contradicted each other.

Not only from this testimony, but from a study of all of it, the idea of manslaughter is not only not shown, but is repelled. There was no manslaughter, the testimony in no way properly raised or suggested it.

The 15th paragraph of the court's charge is as follows:

"15. Every person is permitted by law to defend himself against any unlawful attack, reasonably threatening injury to his person and is justified in using all the necessary and reasonable force to defend himself, but no more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against any unlawful and violent attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury."

The appellant complains of the first sentence of this paragraph claiming it an illegal limitation on his right of self-defense and tended to impress the jury with the belief that the court thought the defendant had used greater force than was necessary and that he should have resorted to other means of defense before shooting. And cites the case of Huddleston v. State, 54 Texas Crim. Rep., 93, 112 S. W. Rep., 64.

In the Huddleston case this particular sentence was held erroneous. The report of the case does not show what the remainder of the charge on that subject was. It is always necessary to consider the whole charge on a given subject and the connection in which the matter is submitted before it can be determined whether error or not. The 15th paragraph of the court's charge, as above quoted, is general and perhaps the words therein "but no more than the circumstances reasonably indicate to be necessary," should not have been used. But this charge, when considered as a whole, and in the connection it was used, could not have had the effect appellant contends it might have had in this case. The 16th paragraph of the charge, which follows the above 15th, submits to the jury the case on murder in the second degree. Then in separate and distinct paragraphs the court charged as follows:

"17. A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person and it is not necessary that there should be actual danger provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"18. If from the evidence you believe the defendant killed the said R. H. Hague, but further believe that at the time of so doing the deceased by his act or acts (if any) caused defendant to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation of fear, the defendant killed the deceased, then you should acquit him and say by your verdict not guilty.

"19. You are further charged in connection with the law of self-defense that where a defendant accused of murder seeks to justify himself on the ground of threats against his own life he is permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the homicide unless it be shown that at the time of the homicide the person killed by some act then done manifested an intention to execute the threats so made. It is not practicable to fix on what the act manifesting the intention of the deceased to execute his threats shall be; but it must be some act reasonably calculated to induce the belief in the mind of the defendant, viewing the case from his own standpoint and no other that the threatened attack has then been commenced to be then executed.

"20. So if you find from the evidence that the deceased had made a threat or threats against the life of the defendant, or whether the deceased had made such threats or not if the defendant had been informed by some person or persons before the homicide that such threat or threats had been made by deceased and the defendant believed such information to be true, and further you find that at the time of the killing the deceased was then doing or had then done some act which was reasonably calculated to induce in the mind of defendant

the belief, viewing the case from the defendant's standpoint, that the threatened attack had then commenced to be then executed, then if under such circumstances he shot and killed the deceased he was justifiable, and if you so find, you will return a verdict of not guilty."

So that it is seen thereby, when the court submitted the case on the evidence of a finding by the jury, he correctly submitted self-defense without in any way qualifying it by the words complained of in the 15th paragraph. In our opinion the error, if error, in the use of the words objected to was not calculated to injure the rights of the defendant, and did not injure his rights. Code Criminal Procedure, article 743 (723).

The only other question necessary to be considered is the 9th ground of appellant's motion for new trial, which is as follows:

"The court erred in paragraph 20 of his general charge to the jury because the same limits the law of threats to those actually conveyed to defendant before the killing. The evidence shows that deceased had done acts and made threats against defendant which were not communicated to him until after the killing, yet such threats were admissible and the court should have so instructed the jury uncommunicated threats were admissible and proper evidence for the purpose of showing that in all probability deceased began the attack and that he meant to kill or injure defendant."

This ground of complaint is very general and it may be so much so that we would not be required to consider it. See the authorities above cited on that question. However, upon consideration of it, we are of the opinion that it does not present reversible error. The whole charge of the court on the subject is given above.

As stated above, the evidence, without contradiction, unquestionably shows that the deceased made many threats to kill appellant; that they extended over a period of about two years and became more frequent and more direct and violent as time went on, and until within thirty minutes, if not thirty seconds, before appellant killed deceased. The appellant had absolute knowledge of them all, as shown above. The State did not controvert any of this. There is no pertinent or forcible evidence in the record that any of the threats made were not communicated to the appellant. The evidence tends strongly to show, if it does not unquestionably show, that the appellant had full notice and knowledge of all of them. Whether communicated or not, the jury had the full benefit of all of them and could not have been misled in the remotest degree by the court not charging on uncommunicated threats, even if there were any. The uncommunicated threats, if there were any, could have been used by the jury only for the purpose of determining whether the deceased, in the language of appellant's objection, "began the attack and that he meant to kill or injure defendant" before the appellant shot and killed him. The jury having all of the communicated threats, established without controversy and overwhelmingly, could not have been misled by the court not telling them

they could consider the uncommunicated threats, if any, for the purpose of determining who first "began the attack" at the time of the killing.

What we have said about the insufficiency of any "pertinent or forcible" testimony suggesting manslaughter, above, we also say about the testimony in this case on the question of uncommunicated threats, and, if any, it is "so weak, trivial, light and remote" as not to have called for any charge by the court on uncommunicated threats. See the authorities above cited on that point. In our opinion the failure of the court to charge on uncommunicated threats, even if there were any, was not calculated to and did not injure the rights of appellant. Code Criminal Procedure, article 743 (723).

There being no reversible error, the judgment will be affirmed.

*Affirmed.*

DAVIDSON, Presiding Judge.—I dissent and may write out my views at length later.

DAVIDSON, Presiding Judge (dissenting).—My brethren have affirmed the judgment, to which at the time I noted my dissent. One of the exceptions to the charge in the motion for new trial is as follows: "The court erred in failing to charge the jury on the law of manslaughter and in not submitting to them that issue under the facts of the case." My brethren hold that this does not present the question, that the exception is too general, and, therefore, they were not required to pass upon that issue, but they hold, in effect, that issue was not in the case. I desire to say that the exception, in my judgment, is sufficient. I have given my assent, at least have not dissented from some of the opinions recently delivered by my brethren, and some anterior to their accession to this court, following Joseph v. State, 59 Texas Crim. Rep., 82. That opinion, however, when investigated and scrutinized does not bear out the decisions which follow it. The exception in the Joseph case is as follows: "Because the court erred in his charge to the jury on manslaughter." It may be that the court in rendering that opinion was correct in saying that was not sufficient. Many cases have been affirmed because it was held the exceptions to the charge as contained either in the bill of exceptions or in motion for new trial were not sufficient to point out the objections urged to the charge. I understand the general rule to be as asserted by the opinions in this State, that the exception or exceptions to the charge must point out the objections urged to it and upon which reliance is had for a reversal. Where the issue of manslaughter, for instance, is raised, or the issue of self-defense is part of the case, and the court fails to give any charge upon that issue of any character, then the general exception that the court failed to charge upon that issue is sufficient in pointing out the error on the part of the court in not charging the

law applicable to such issue. This is in the nature of a general demurrer or exception, and if the facts show that the issue was in the case and not charged upon, then it was the duty of the court under the statute to charge all the law applicable to the case, and not having given any charge upon the issue, a general exception or objection that the court failed to charge the law applicable to such issue would be sufficient. The rule might be different and perhaps would be different if the court had submitted the issue of manslaughter, or of self-defense, as the case may be, or any other issue, but had not sufficiently applied the law of the case, and an exception was reserved to the failure of the court to charge fully the law applicable to such issue, then the exception should point out the defect in the charge. The difference is easily discernable between the rule as to the general exception as herein put and the rule as to special exception. To restate, if the issue is in the case and no charge is given, then a general exception, that the court failed to charge on the particular issue, because raised by the facts, is a sufficient objection to the charge.; but if the court gave a charge on the particular issue, and it was not sufficient or not full enough or was erroneous, then it might or would become the duty of the objecting party to point out the error or omission. The issue of manslaughter being in this case, the objection urged was sufficient to raise the question for revision, because it specifically points out the failure of the court to charge upon an issue directly raised by the facts and upon which *no* charge was given. Of course, if the issue was not raised by the facts, there would be no force to the objection, but that would go to the application of the objection to the charge and not to the sufficiency of the objection. That manslaughter was in the case, in my mind, is not a debatable question. There is a strong conflict in the evidence, it being, so far as the witnesses are concerned, well balanced as to who began the difficulty, and it may be stated also in this connection that in this testimony there may be discovered the fact that defendant may have shot before being fully justified, although the deceased was making a demonstration at the time appellant fired the first shot. I discussed this matter in the dissenting opinion in the recent case of Treadway v. State, giving the reasons and citing the authorities, and refer to that case, believing it to be directly applicable to this case. I do not care further to discuss that question.

The court charged the jury with reference to self-defense as follows: "Every person is permitted by law to defend himself against any unlawful attack, reasonably threatening injury to his person and is justified in using all the necessary and reasonable force to defend himself, but no more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against any unlawful and violent attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury." It will be noticed that this charge is applicable and was given only with reference to the issue of perfect self-defense. This is

recognized by my brethren in their opinion wherein it is stated that the issues in the case were murder in the first and second degree, and the perfect right of self-defense. This was a guarded statement in the opinion, because if the right of imperfect self-defense was in the case, then the charge on manslaughter would be a necessity. So we have not the issue of imperfect self-defense in the case, but only the issue of perfect self-defense. The charge given by the court, under all the cases where the question is the right of perfect self-defense, is erroneous. Scott v. State, 46 Texas Crim. Rep., 305; Crenshaw v. State, 48 Texas Crim. Rep., 77; Huddleston v. State, 54 Texas Crim. Rep., 93 Carson v. State, 57 Texas Crim. Rep., 394; Castro v. State, decided on April 17 of the present term of court; Antu v. State, decided by this court on April 24, present term. My brethren hold that this charge is not error. In all the cases above cited it was held error, the charge being identical in language in all the cases. On April 17 the Castro case was decided, and on April 24 the Antu case was decided, where this identical charge was held error. These cases are not noticed by my brethren in their opinion—neither qualified nor overruled. If the opinion in this case is correct, then the above cited cases ought to have been overruled. I deem it unnecessary to cite other authorities. It has been the rule laid down in the history of our jurisprudence, even up to within a month of the decision of this case. Our jurisprudence should not be left in this condition. Those cases were either correct or not; if not correct, they should be overruled; if correct, followed.

There is another question raised. My brethren indicate in the opinion it is not sufficiently presented to be reviewed. I quote the exception in the motion for a new trial. It is with reference to uncommunicated threats. The language of the motion for new trial is as follows: "The court erred in paragraph 20 of his general charge to the jury because the same limits the law of threats to those actually conveyed to defendant before the killing. The evidence shows that deceased had done acts and made threats against defendant which were not communicated to him until after the killing, yet such threats were admissible and the court should have so instructed the jury uncommunicated threats were admissible and proper evidence for the purpose of showing that in all probability deceased began the attack and that he meant to kill or injure defendant." I do not understand how, so far as the question is presented in the ground of the motion for new trial, it could be more specific. It is not necessary for the party making his objection to set out all the evidence in the case bearing on the issue. The particular objection here is stated and specifically pointed out, and not only so, but the court did not charge the law applicable to uncommunicated threats anywhere in the charge, and the record discloses beyond any cavil uncommunicated threats and acts of the deceased, which were not known to appellant until after the homicide. Wherever the issue in the case is as to who began the difficulty, then uncommunicated threats are always held to be admissible, and in this case were admis-

sible and admitted. The statement of facts clearly shows such to be the case. That this was error see Huddleston v. State, 54 Texas Crim. Rep., 98; Trotter v. State, 37 Texas Crim. Rep., 468; Pitts v. State, 29 Texas Crim. App., 374; Levy v. State, 28 Texas Crim. App., 203; Pate v. State, 54 Texas Crim. Rep., 464, 130 Am. St. Rep., 875; State v. Blee, 133 Iowa, 733.

In the Huddleston case, supra, the court gave a charge on uncommunicated threats, but it was held insufficient. In the Huddleston case this charge was given: "Threats made by a deceased person against the life of the person accused of the murder of such deceased person, while not communicated to defendant, may be considered by the jury in ascertaining the condition of the mind of the deceased at the time of the homicide." This was the charge given in that case upon uncommunicated threats. It was held incorrect, and among other reasons for reversing that case, this was given as one of the reasons: that "The question of self-defense was in the case, and uncommunicated threats were of decided importance in solving the question as to who began this difficulty. While uncommunicated threats would not justify because the appellant was not aware of such threats, yet it is a potent circumstance to be considered by the jury as to whether or not deceased began the attack that ended in the homicide. It was a very serious issue in the case as to who began the difficulty resulting in the homicide. This charge should not have been thus limited." The Huddleston case has been followed wherever the question has been presented to this court, and it follows previous decisions.

In State v. Blee, supra, this identical question was before the Supreme Court of Iowa. We make this quotation from that decision:

"Evidence tending to show threats made by the deceased against the defendant was admitted in evidence. Some of such threats were confessedly not communicated to the defendant prior to the homicide. The court instructed the jury that uncommunicated threats could be considered for no purpose save as an aid in determining who was the aggressor in the fatal encounter. This instruction is denounced by counsel for appellant as error; and it is the argument that the uncommunicated threats had bearing, not only to show who began the affray, but to corroborate the evidence of communicated threats, and also to show the attitude of the deceased toward defendant. The precise question is now before this court for the first time. However, it has arisen and been passed upon by the courts of sister states with more or less frequency, and almost without exception, as far as we have been able to discover the rule as here contended for by appellant has been adopted. In Levy v. State, 28 Texas Crim. App. 203 (12 S. W., 596, 19 Am. St. Rep., 826), it is said: 'Such uncommunicated threats would be admissible and proper evidence for the purpose of showing that in all probability the deceased made such attack, and his motive in so doing. Such evidence has also been held admissible to corroborate evidence of communicated threats previously admitted'—citing Holler v. State, 37

Ind., 57; Cornelius v. Com., 15 B. Mon. (Ky.), 539; Horrigan & Thompson on Self-Defense. In Cornelius v. Com., it was said: 'We think that this testimony should, under the circumstances in this case, have been admitted. It tended to confirm the other evidence that Hopson had made threats against the prisoner, and to counteract a presumption of fabrication by the witnesses who gave their testimony. Besides, Hopson's intention to make an attack on the accused was an important matter, as well as the belief of the existence of such an intention on the part of the prisoner.' And this rule was expressly approved in Holler v. State. In State v. Williams, 40 La. Ann., 168 (3 South., 629), it was said: 'We think that reason and authority concur in establishing their (uncommunicated threats) admissibility, under the circumstances, as corroborating the evidence as to the uncommunicated threats, as indicating their meaning and seriousness, as establishing the purpose with which the deceased provoked the encounter, and throwing light upon his acts in connection therewith.' In State v. Turpin, 77 N. C., 473, it was said: 'This evidence (uncommunicated threats) was competent, and should have been admitted for several reasons: First, the uncommunicated threats were admissible for the purpose of corroborating the evidence of the threats which had already been given; second, they were admissible to show the state of feeling of the deceased toward the prisoner; third, for ascertaining who began the affray.' In State v. Brown, 22 Kan., 230, in speaking of uncommunicated threats, the court said: 'Again, a rejection of these threats was error, as evidence of communicated threats had already been admitted, and in such cases it is competent, for the purpose of corroborating this testimony, to introduce evidence of uncommunicated threats'—citing authorities. In Roberts v. State, 68 Ala., 156, in speaking of uncommunicated threats in cases where self-defense is relied upon, it was said that such threats 'recently made, are admissible for the purpose of showing the quo animo of such demonstration or attack. So uncommunicated threats are frequently admitted for the purpose of corroborating those that are communicated and which have already been admitted; and, likewise, where it is doubtful from the testimony which party commenced the affray, threats of this character are admissible as in the nature of facts to show who was properly the assailant.' In Territory v. Hall, 10 N. M., 545 (62 Pac., 1083), this question received very thorough consideration at the hands of the court, and the following conclusions were announced: 'There are a few cases which hold that uncommunicated threats, to be admissible for any cause, must be shown to have been communicated to the accused, and others which hold that uncommunicated threats are not admissible, unless they constitute a part of the res gestae; but the more modern and better reasoned cases favor the admission of such evidence in the following instances: (a) To show who began the affray; (b) to corroborate evidence of communicated threats; and (c) to show the attitude of the deceased.' To our minds each of the cases thus cited is exactly in

point, and we think the rule therein announced should be adopted for this State.   From this it follows that the instruction complained of must be condemned."

What was said by the Supreme Court of Iowa is directly applicable to this case.   The evidence discloses in this case, first, all kinds and character of threats against the life of the defendant by the deceased. Some of these threats were communicated and some were not com· municated until after the homicide.   The evidence also shows acts of preparation, laying in wait, for the purpose of killing the defendant by deceased, the importuning of one witness, at least, to induce the appellant to accompany this witness to a point where deceased could shoot him from a window.   The evidence for the State shows that appellant, in passing the house where the difficulty occurred, saw the deceased and immediately began his attack, shooting the deceased to death.   The evidence from eyewitnesses for the defendant was to the effect that while appellant was passing the door of the house deceased saw him and immediately turned facing him and threw his hand to where he carried his pistol and where it is shown by all the witnesses that he did carry it, and that appellant immediately fired.   It   is also shown that the wife of deceased ran in immediately and got the pistol from her husband's pocket and placed it under her garments and left the room with it.   This is a controverted issue, however, but that does not relieve the court from charging upon the issue.   It was an issue. There is no question of the fact that the wife of deceased came in the room where he was, knelt down over him, was about his person and went out of the room almost immediately.   The fact that she got the pistol is confirmed by one side and denied by the other.   These matters and facts were before the jury, and it was a controverted issue as to who began that difficulty, who was in the wrong, who made the first demonstration.   This being true, the uncommunicated threats were of first importance in the trial of the case for a solution of that question. These taken in connection with the proved bad character for violence and the dangerous character of the deceased, his promptness in executing threats made, constituted this one of the important issues in the case.   Appellant was clearly entitled to have these matters presented to the jury.   It was a death struggle, for this evidence makes it clear and unequivocal that an assault by the deceased meant death to the assaulted party.   This evidence was admissible for all the purposes stated in the quotation from the case of State v. Blee, above, and the charge should have so instructed the jury.   It was a part of the law of the case, and should have been charged, for in this record there was no more important issue to be decided by the jury than this particular one.   Upon it hung the determination of the case in the minds of the jury.   The court gave a charge on communicated threats, but failed to give the charge on uncommunicated threats.   The jury would naturally conclude under such circumstances that the court did not regard the

uncommunicated threats as of any importance because not conveyed to defendant, and they were unapprised of the law and the effect of such evidence in the absence of such charge.

Without going into any detailed statement further in regard to this matter, I make the above observations as some of the reasons why I dissent.